**Marvin Edwin JOHNSON, Petitioner–Appellant,**

v.

**Harry K. SINGLETARY, Jr., Secretary, Florida Department of Corrections, Respondent–Appellee.**

No. 89–3195.

United States Court of Appeals, Eleventh Circuit.

July 25, 1991.

Rehearing Denied Sept. 4, 1991.

**1168**

Billy H. Nolas, Tallahassee, Fla., for petitioner-appellant.

Mark Menser, Asst. Atty. Gen., Dept. of Legal Affairs, Tallahassee, Fla., for respondent-appellee.

Before TJOFLAT, Chief Judge, FAY, KRAVITCH, JOHNSON, ANDERSON, CLARK, EDMONDSON, COX, BIRCH and DUBINA, Circuit Judges, and HILL*, Senior Circuit Judge**.

---

* Senior U.S. Circuit Judge Hill elected to participate in this decision pursuant to 28 U.S.C. § 46(c).

** Judge Hatchett recused himself and did not participate in this decision.

COX, Circuit Judge:

Petitioner Marvin Edwin Johnson, a Florida death row inmate, appeals the district court's denial of his 28 U.S.C. § 2254 petition for a writ of habeas corpus. A panel of this court concluded that Johnson was entitled to an opportunity to prove the ineffective assistance of sentencing counsel claim contained in his second federal habeas petition. This is so, the panel concluded, notwithstanding the fact that the claim is procedurally defaulted because Johnson did not present the claim to Florida courts under Florida's procedural rules, notwithstanding the fact that there was no "cause" for his having failed to do so, and notwithstanding the fact that he did not present the claim in his first federal habeas petition. *Johnson v. Dugger*, 911 F.2d 440, 444 (11th Cir.), *vacated*, 920 F.2d 721 (1990). He is entitled to pursue the claim, the panel majority concluded, because he "has proffered evidence which if true would establish that he probably was actually innocent of the death sentence he received." *Id.* at 477. The en banc court decided to review the case primarily to address the question of what it means to be "actually innocent" of a death sentence. We conclude that Johnson is not actually innocent of the sentence he received and affirm the district court's denial of habeas relief.

## I. BACKGROUND AND PROCEDURAL HISTORY

In June 1978, Warrington Pharmacy in Pensacola, Florida, was robbed. In the course of that robbery Woodrow Moulton, a pharmacist and the owner of the pharmacy, was shot and killed. Marvin Edwin Johnson was indicted for first-degree murder and armed robbery. The Supreme Court of Florida summarized the State's evidence at trial as follows:

> Gary Summitt, an employee of Warrington Pharmacy and an eyewitness to the robbery and the murder, testified that while working at the pharmacy on the evening of June 7, 1978, he went to the back of the store to ask the pharmacist, Woodrow Moulton, a question. There he saw the defendant Johnson holding a gun on Moulton who was at the pharmacy safe putting articles in a bag, and he heard Johnson order Moulton to put certain drugs and money from the safe into the bag. After obtaining the drugs and money, Johnson started towards the front of the store. Moulton then grabbed a gun from behind the prescription counter. There was an exchange of gunfire, and Moulton continued to fire at Johnson until his gun was emptied. No longer able to defend himself, Moulton stood up with his hands in the air. Johnson then walked up to within a foot and a half of the defenseless pharmacist, said "You think you're a smart son-of-a-bitch, don't you?", and shot him in the chest.

*Johnson v. State*, 393 So.2d 1069, 1071 (Fla.1980), *cert. denied*, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981).

On December 8, 1978, a jury found Johnson guilty of first-degree murder and armed robbery.[1] The next day, the same jury, acting in an advisory role, recommended Johnson be sentenced to life imprisonment on the murder conviction. About one month later, at the close of a sentencing hearing before the trial judge, the judge overrode the advisory jury's recommendation and sentenced Johnson to death.[2] In his written findings, the judge found five statutory aggravating circumstances and no statutory mitigating circumstances.[3]

---

1. Two court-appointed attorneys represented Johnson prior to trial and in the guilt/innocence phase of the trial.

2. A different team of three court-appointed attorneys represented Johnson at both the sentencing hearing before the advisory jury and the sentencing hearing before the trial judge.

3. The five aggravating circumstances identified were:

   (1) at the time of the murder, Johnson was under a sentence of imprisonment, but had escaped, *see* Fla.Stat. § 921.141(5)(a); (2) Johnson had previously been convicted of two felonies involving the use or threat of violence

Johnson appealed his convictions and sentence to the Supreme Court of Florida.[4] That court unanimously affirmed his convictions. *Johnson v. State*, 393 So.2d 1069 (Fla.1980), *cert. denied*, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981). The court also affirmed Johnson's sentence, by a vote of four justices to three.[5] *Id.* The governor of Florida signed a death warrant in May 1982.

Rather than seeking habeas relief in the state courts pursuant to Florida Rule of Criminal Procedure 3.850, Johnson petitioned the district court for the Northern District of Florida for a writ of habeas corpus. Johnson's counsel in that proceeding later told the state supreme court that "they elected to raise only certain claims and assumed that they could always come back to state court and raise others." *Johnson v. State*, 536 So.2d 1009, 1011 (Fla.1988).[6] The State did not raise the defense of failure to exhaust state remedies [7] and thus waived that defense. *See Pennington v. Spears*, 779 F.2d 1505 (11th Cir.1986). The district court, after initially granting a stay of execution, denied the petition and thereafter denied Johnson's motion to alter or amend the district court's judgment.

to the person, *see* Fla.Stat. § 921.141(5)(b); (3) Johnson knowingly created a great risk of death to the other three persons present in the drugstore at the time of the murder, *see* Fla. Stat. § 921.141(5)(c); (4) the murder was committed during the commission of an armed robbery, *see* Fla.Stat. § 921.141(5)(d); (5) the manner in which Johnson killed his victim was "atrocious and cruel and was committed to reek revenge upon [the victim] for having defended his life and property in a completely lawful manner," *see* Fla.Stat. § 921.141(5)(h).
*See* Record at 1719–23.

4. Another court-appointed attorney represented Johnson on direct appeal. In that proceeding, Johnson presented the following challenges: (1) a claim addressing the exclusion of an expert witness who would have testified as to the unreliability of eyewitness identification; (2) constitutional challenges that the imposition of the death penalty after the jury had recommended life imprisonment violated his right not to be subjected to double jeopardy, his right to due process, his right to trial by a jury, and his right not to be subjected to cruel and unusual punishment; (3) a claim that the trial judge's override of the advisory jury's recommendation of life imprisonment was inconsistent with the standard set forth in *Tedder v. State*, 322 So.2d 908 (Fla.1975); (4) a claim that improper cross-examination by the prosecutor constituted prosecutorial misconduct and denied him a fundamentally fair trial; and (5) an attack on the trial court's decision to admit photographic evidence reconstructing the crime scene. *See Johnson v. State*, 393 So.2d 1069 (Fla.1980), *cert. denied*, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981).
During the pendency of his direct appeal, Johnson joined with 122 other Florida death row inmates in filing an application for extraordinary relief and a petition for a writ of habeas corpus in state court based upon the allegation that the Supreme Court of Florida had a practice of reviewing *ex parte,* non-record information concerning capital defendants. The Su-

preme Court of Florida denied relief. *Brown v. Wainwright*, 392 So.2d 1327 (Fla.), *cert. denied*, 454 U.S. 1000, 102 S.Ct. 542, 70 L.Ed.2d 407 (1981).

5. The court held that the trial judge erred in finding an aggravating circumstance based upon Johnson having created a great risk of death to many persons. "Three people are not 'many persons' as we have interpreted that term in the context of section 921.141(5)(c)." *Johnson v. State*, 393 So.2d 1069, 1073 (Fla.1980) (citation omitted). The other four aggravating circumstances found by the trial judge were upheld. Under Florida law, the sentencing court may impose a sentence of death if the defendant is convicted of first degree murder, accompanied by at least one statutory aggravating circumstance. Fla.Stat. § 921.141 (Supp. 1991).

6. In his first federal habeas proceeding, Johnson was represented by three volunteer attorneys, at least one of whom was also court-appointed. None of the three attorneys represented Johnson at trial or sentencing. In his petition, Johnson raised the following issues: (1) the *Brown* issue (*see* footnote 4); (2) the jury override issue; (3) the trial judge's application of the *Tedder* jury override standard; (4) the prosecutorial misconduct issue; (5) the expert witness issue; (6) the allegedly improper admission of photographs of the interior of the pharmacy; (7) whether he was denied due process because the Supreme Court of Florida failed to remand his case for resentencing after it had found that one of the five aggravating circumstances relied upon by the trial court did not exist; and (8) whether the trial court's alleged failure to consider nonstatutory mitigating factors proffered by Johnson deprived him of due process.

7. *Johnson v. Wainwright (Johnson I)*, 806 F.2d 1479, 1481 n. 2 (11th Cir.1986), *cert. denied*, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 157 (1987).

Johnson appealed to this court, raising seven issues: (1) whether the state trial court's refusal to consider lingering doubt about the certainty of proof violated the Eighth and Fourteenth Amendments; (2) whether the state trial court improperly refused to consider or weigh nonstatutory mitigating circumstances; (3) whether the state trial court's exclusion of expert testimony on factors affecting the reliability of eyewitness identification was unconstitutional; (4) whether prosecutorial misconduct during the cross-examination of Johnson at trial rendered the trial fundamentally unfair; (5) whether the district court improperly denied discovery regarding Johnson's claim of a due process violation by the Supreme Court of Florida; (6) whether the imposition of a death sentence by a trial court following a jury recommendation of life is unconstitutional; and (7) whether an alleged error of fact in the Supreme Court of Florida's decision, relating to Johnson's use of the term son-of-a-bitch, improperly affected the determination of aggravating circumstances in this case.

Three claims asserted in the district court were not argued on appeal and were deemed abandoned. *See Johnson v. Wainwright (Johnson I)*, 806 F.2d 1479, 1481 n. 5 (11th Cir.1986), *cert. denied*, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 157 (1987). Those claims were: the claim that the trial judge erred in the application of the *Tedder* standard (an issue Johnson is raising in the present proceeding); the claim that photographs of the interior of the pharmacy were improperly admitted; and the claim

that the Supreme Court of Florida erred in not remanding the case for resentencing after it struck one of the aggravating circumstances found by the trial judge. This court addressed all of Johnson's other claims on the merits, and we affirmed the district court's denial of relief. *Johnson I*, 806 F.2d at 1482–87. Johnson's second death warrant was signed in March 1988.

On April 10, 1988, three days before his scheduled execution, Johnson petitioned the Supreme Court of Florida for a writ of habeas corpus and a stay of execution. The court denied the requested relief the next day, reaching the merits of all of Johnson's claims. *Johnson v. Dugger (Johnson II)*, 523 So.2d 161 (Fla.1988).[8] On the same day Johnson petitioned the Supreme Court of Florida for habeas relief, he also filed a motion in the state trial court for post-conviction relief pursuant to Florida Rule of Criminal Procedure 3.850.[9] There, Johnson for the first time claimed that his sentencing counsel rendered ineffective assistance by failing to present evidence of Johnson's good character and by failing to present and develop available psychological evidence at sentencing.[10] The trial court denied the motion for post-conviction relief on April 11, 1988, because the motion had not been filed prior to January 1, 1987, as required by rule 3.850. The Supreme Court of Florida stayed Johnson's impending execution and reviewed the trial court's judgment. The supreme court agreed that the motion had not been timely filed and consequently the court ruled that it was procedurally barred. *Johnson v.*

---

**8.** During this proceeding, Johnson was represented by court-appointed attorneys. In his petition, Johnson raised five claims: (1) the trial court restricted its consideration of mitigating circumstances to the statutory list in violation of *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987); (2) appellate counsel ineffectively presented the override issue; (3) appellate counsel ineffectively challenged the aggravating circumstances found by the trial court; (4) appellate counsel was ineffective in failing to appeal the denial of Johnson's motion to suppress a pretrial photographic identification; and (5) the excusal of two jurors pursuant to section 40.-01(1), Florida Statutes (1977), which provided

automatic exemption from jury service for pregnant women and women with children under age 15, deprived Johnson of his Sixth Amendment right to trial by a fair cross-section of the community and violated the Equal Protection Clause of the Fourteenth Amendment.

**9.** During this proceeding, Johnson was represented by the same court-appointed attorneys who represented him in the Supreme Court of Florida proceeding (*Johnson II*).

**10.** In addition to Johnson's new claim of ineffective assistance of sentencing counsel, he also claimed that his trial counsel rendered ineffective assistance by failing to obtain an independent ballistics expert.

*State (Johnson III)*, 536 So.2d 1009, 1011 (Fla.1988). Two justices dissented; they believed that despite the procedural bar, the court should have reached what they believed was a potentially meritorious issue (the ineffective assistance of counsel at sentencing issue) and remanded for an evidentiary hearing. *See Johnson III*, 536 So.2d at 1012–13 (Barkett, J., dissenting).

The governor of Florida signed a third death warrant in February 1989. On March 10, 1989, six days before Johnson's scheduled execution, Johnson filed his second federal petition for habeas relief—the one we confront today.[11] In his petition, Johnson presents five claims: (1) that his sentencing hearing violated the Supreme Court's decision in *Hitchcock v. Dugger*, 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347 (1987), because the trial judge, in overriding the advisory jury's recommendation, failed to consider nonstatutory mitigating circumstances; (2) that his appellate counsel was ineffective in not challenging on direct appeal the denial of his motion to suppress an allegedly unreliable and suggestive photographic identification procedure; (3) that the Florida courts, by permitting the trial judge to override the jury's recommendation in this case, have applied their reviewing standard in such a manner as to result in an arbitrary and capricious imposition of the death sentence, in violation of the Eighth and Fourteenth Amendments; (4) that his trial counsel, by failing to prepare a rebuttal to the state's ballistics and crime-scene reconstruction evidence, was ineffective; and (5) that his trial counsel rendered ineffective assistance both by not ensuring that a proper mental health examination was conducted prior to his sentencing hearing before the advisory jury and by failing to conduct any additional investigation between the initial sentencing hearing and the sentencing hearing before the trial judge.

On March 14, 1989, the district court, without an evidentiary hearing, denied Johnson's petition. The court rejected on the merits Johnson's *Hitchcock* claim and

his claim that appellate counsel was ineffective. The court further held that Johnson's challenge to the jury override constituted an abuse of the writ and that his claims of ineffective assistance of trial and sentencing counsel were procedurally barred. The next day, the court rejected Johnson's motion to alter or amend judgment but granted Johnson's request for a certificate of probable cause. This court granted Johnson's motion for a third stay of execution.

Johnson appealed the district court's denial of relief on all five claims. A panel of this court affirmed the district court's denial of relief on all claims except the claim of ineffective assistance of counsel at sentencing. *Johnson v. Dugger*, 911 F.2d at 480. With regard to that claim, a two-judge majority vacated the district court's denial of relief and remanded the claim to the district court for an evidentiary hearing. It is the resolution of that claim that is the primary force behind the en banc court's decision to revisit this case. We disagree with the panel majority's resolution of Johnson's ineffective assistance of counsel at sentencing claim, and we will devote our analysis to explaining why the district court's decision to deny relief on that claim should be affirmed. We will then briefly address Johnson's other claims.

## II. JOHNSON'S CLAIM OF INEFFECTIVE ASSISTANCE OF COUNSEL AT SENTENCING: CONTENTIONS

Johnson argues he received ineffective assistance of counsel during the sentencing phase of his trial. He contends that his court-appointed counsel at sentencing and the court-appointed psychologist who assisted counsel and testified at the sentencing hearing were unprepared to put on an effective defense. He further asserts that counsel should have and inexplicably failed to inform the psychologist of Johnson's long history of drug abuse and addiction. Had this evidence been developed, he argues, sentencing counsel would have been able to create a record that probably would

---

11. In the present proceeding, Johnson was represented by court-appointed attorneys in the dis-

trict court, before the panel and before the en banc court.

have influenced the sentencing judge to agree with the jury that life imprisonment was the appropriate sentence. Even if the judge did override the jury verdict, Johnson charges, the Supreme Court of Florida would have reversed that decision pursuant to Florida's *Tedder* standard. That standard requires that "[i]n order to sustain a sentence of death following a jury recommendation of life, the facts suggesting a sentence of death should be so clear and convincing that virtually no reasonable person could differ." *Tedder v. State*, 322 So.2d 908, 910 (Fla.1975).

The State argues the claim is procedurally barred and even if the claim is not procedurally barred, the decision not to develop the drug abuse evidence was a strategic one and thus cannot constitute ineffective assistance of counsel. The district court agreed that the claim is procedurally barred. The court noted that Johnson sought to raise the claim in his Florida Rule 3.850 proceedings. The Supreme Court of Florida, however, rejected the claim because Johnson had not filed his rule 3.850 petition within the rule's time constraints. Therefore, the supreme court refused to review the claim on the merits. *Johnson III*, 536 So.2d at 1011.

## III. PROCEDURAL DEFAULT [12]

■ The federal courts' authority to review state court criminal convictions pursuant to writs of habeas corpus is severely restricted when a petitioner has failed to follow applicable state procedural rules in raising a claim, that is, where the claim is procedurally defaulted. Federal review of a petitioner's claim is barred by the procedural default doctrine if the last state court to review the claim states clearly and expressly that its judgment rests on a procedural bar, *Harris v. Reed*, 489 U.S. 255, 263, 109 S.Ct. 1038, 1043, 103 L.Ed.2d 308 (1989), and that bar provides an adequate and independent state ground for denying relief. *See id.* at 262, 109 S.Ct. at 1042–43; *Johnson v. Mississippi*, 486 U.S. 578, 587, 108 S.Ct. 1981, 1987, 100 L.Ed.2d 575 (1988). The doctrine serves to ensure petitioners will first seek relief in accordance with state procedures, *see Presnell v. Kemp*, 835 F.2d 1567, 1578–79 (11th Cir. 1988), *cert. denied*, 488 U.S. 1050, 109 S.Ct. 882, 102 L.Ed.2d 1004 (1989), and to "lessen the injury to a State that results through reexamination of a state conviction on a ground that a State did not have the opportunity to address at a prior, appropriate time." *McCleskey v. Zant*, —— U.S. ——, ——, 111 S.Ct. 1454, 1470, 113 L.Ed.2d 517 (1991).

The procedural default doctrine implicates "concerns flowing from the significant costs of federal habeas corpus review. To begin with, the writ strikes at finality." *Id.* at ——, 111 S.Ct. at 1468. Finality has added significance in the context of a federal attack on a state conviction. *Murray v. Carrier*, 477 U.S. 478, 487, 106 S.Ct. 2639, 2645, 91 L.Ed.2d 397 (1986). "Federal intrusions into state criminal trials frustrate both the state's sovereign power to punish offenders and their good-faith attempts to honor constitutional rights." *Engle v. Isaac*, 456 U.S. 107, 128, 102 S.Ct. 1558, 1572, 71 L.Ed.2d 783 (1982). Federal collateral review also "places a heavy burden on scarce federal judicial resources, and threatens the capacity of the system to resolve primary disputes." *McCleskey v. Zant*, —— U.S. at ——, 111 S.Ct. at 1469. Finally, federal habeas review "may give litigants incentives to withhold claims ...

---

**12.** Judge Tjoflat, in a separate opinion, notes his belief that in cases such as this one, where a petitioner presents a claim that is barred by both the abuse of the writ doctrine and the procedural default doctrine, we should analyze whether to excuse the abuse of the writ before we proceed to an examination of whether we should excuse the procedural default. *See post* at 1187 n. 4. As a general proposition, that approach may be the proper one.

In this case, however, we believe there are two reasons why it is prudent to address the procedural default issue before the abuse of the writ question. First, the parties, at the written request of the en banc court, focused both their briefs and arguments on the procedural default question. Second, this court took this case en banc primarily to resolve the procedural default issue.

and may establish disincentives to present claims when evidence is fresh." *Id.* Far more severe are the disruptions when a state's procedural rules are bypassed and a claim is presented for the first time in federal court. *Cf. id.,* —— U.S. at ——, 111 S.Ct. at 1469.

■ The Supreme Court of Florida reviewed Johnson's ineffective assistance of counsel at sentencing claim in *Johnson III,* 536 So.2d 1009 (Fla.1988). Johnson first asserted the claim in the trial court in April 1988, more than nine years after the conclusion of his trial and sentencing. The supreme court affirmed the trial court's denial of Johnson's motion for post-conviction relief because it had not been filed prior to January 1, 1987, as required by Florida Rule of Criminal Procedure 3.850.[13] This is an adequate and independent state ground for refusing to consider this claim, *Whiddon v. Dugger,* 894 F.2d 1266, 1267–68 (11th Cir.), *cert. denied,* —— U.S. ——, 111 S.Ct. 102, 112 L.Ed.2d 73 (1990), and the supreme court clearly and expressly rested its judgment on rule 3.850's procedural bar, *see Johnson III,* 536 So.2d at 1011. The state of Florida has a significant and legitimate interest in enforcing the provision in rule 3.850 that limits the time within which challenges to criminal convictions may be brought, and no one argues otherwise.[14] We conclude, as did the panel, that federal review of the claim is barred unless Johnson can show that we should apply an exception to the procedural default doctrine.

## IV. THE EXCEPTIONS TO THE PROCEDURAL DEFAULT DOCTRINE

■ There are two exceptions to the procedural default bar. A federal court may still review the merits of Johnson's claim, despite the procedural bar, if Johnson can establish that he meets one of these exceptions. First, a procedural default may be ignored by a federal court if the petitioner can show both "cause for the default and prejudice attributable thereto." *Murray v. Carrier,* 477 U.S. 478, 485, 106 S.Ct. 2639, 2644, 91 L.Ed.2d 397 (1986); *see also Wainwright v. Sykes,* 433 U.S. 72, 90–91, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977). The Supreme Court has created a narrow second exception: "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default." *Carrier,* 477 U.S. at 496, 106 S.Ct. at 2649.

### A. *Cause and Prejudice*

We begin our analysis by examining whether Johnson has demonstrated cause to excuse his procedural default. Johnson asserts that he instructed his lawyers who were handling the state post-conviction proceeding to raise all possible grounds for relief, including any potential ineffective

---

**13.** The rule provides in pertinent part:

A motion to vacate a sentence which exceeds the limits provided by law may be filed at any time. No other motion shall be filed or considered pursuant to this rule if filed more than two years after the judgment and sentence become final unless it alleges (1) the facts upon which the claim is predicated were unknown to the movant or his attorney and could not have been ascertained by the exercise of due diligence, or, (2) the fundamental constitutional right asserted was not established within the period provided for herein and has been held to apply retroactively.

Any person whose judgment and sentence became final prior to January 1, 1985, shall have until January 1, 1987, to file a motion in accordance with this rule.

**14.** The Supreme Court of Florida has made its view of the importance of rule 3.850 clear:

The credibility of the criminal justice system depends upon both fairness and finality. The time limitation of rule 3.850 accommodates both interests. It serves to reduce piecemeal litigation and the assertion of stale claims while at the same time preserv[ing] the right to unlimited access to the courts where there is newly discovered evidence or where there have been fundamental constitutional changes in the law with retroactive application. When Johnson filed his motion for postconviction relief, over nine years had elapsed from the date of the trial. The motion was filed more than fifteen months after January 1, 1987. His claims do not fall within the two exceptions prescribed by the rule. Hence, the trial court properly denied Johnson's motion as untimely.

*Johnson III,* 536 So.2d at 1011.

assistance of counsel claim.[15] Johnson argues that the failure of his attorneys to raise the ineffective assistance of counsel at sentencing claim within the two-year limit imposed by rule 3.850, despite his instructions to do so, constitutes cause for his procedural default. Johnson does not tell us what standard should be applied to determine when post-conviction attorney error will amount to cause. Instead, he argues that in a situation where a prisoner specifically advises his counsel regarding what steps to take in pursuing a habeas corpus petition, and counsel fails to heed those instructions, we should not hold the prisoner to any decisions of his attorney that result in a procedural default.

■ After this case was briefed and argued, however, the Supreme Court decided precisely this issue adversely to Johnson. In *Coleman v. Thompson*, — U.S. —, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991), the Court held: "[t]here is no constitutional right to an attorney in state post-conviction proceedings. Consequently, a petitioner cannot claim constitutionally ineffective assistance of counsel in such proceedings." *Id.*, at —, 111 S.Ct. at 2566 (citations omitted). The Court went on to conclude that because errors of post-conviction counsel cannot be constitutionally ineffective, a petitioner "must 'bear the risk of attorney error that results in a procedural default.'" *Id.* (quoting *Carrier*, 477 U.S. at 488, 106 S.Ct. at 2645). Thus, because Johnson had no constitutional right to counsel during his post-conviction proceedings, his attorneys' errors during those proceedings cannot constitute cause to excuse his procedural default. Because Johnson has failed to establish one element of the cause and prejudice exception, he cannot show the exception applies. *Engle v. Isaac*, 456 U.S. 107, 134 n. 43, 102 S.Ct. 1558, 1575 n. 43 (1982). To obtain review of his ineffective

assistance of sentencing counsel claim, then, Johnson must establish that the second exception to the procedural default doctrine applies.

B. *The Second Exception to the Procedural Default Doctrine: Actually Innocent*

In certain extraordinary circumstances, a federal court has the equitable power to consider an issue notwithstanding the existence of a procedural bar. *See Carrier*, 477 U.S. at 495–96, 106 S.Ct. at 2649. A federal court may do so "where a constitutional violation has probably resulted in the conviction of one who is actually innocent." *Id.* at 496, 106 S.Ct. at 2649. In addition, the Supreme Court, while acknowledging that "the concept of 'actual' as opposed to 'legal' innocence does not translate easily into the context of an alleged error at the sentencing phase of a trial on a capital offense," has concluded that one may be actually innocent of the death penalty. *See Smith v. Murray*, 477 U.S. 527, 537–38, 106 S.Ct. 2661, 2668, 91 L.Ed.2d 434 (1986). The actually innocent exception is alternatively known as the fundamental miscarriage of justice exception. Johnson argues that even if we decide he has not established cause for his failure to abide by Florida's procedural rules, the facts of this case demand that we invoke this second exception to the procedural default doctrine. He asserts that but for the procedural bar, his sentence of death would be vacated in favor of a sentence of life imprisonment. Therefore, according to Johnson, we must exercise our equitable powers and consider his claim on the merits in order to prevent a fundamental miscarriage of justice. The State counters that this is not an appropriate case for the invocation of the second exception to the procedural default doctrine and that to do so

---

**15.** In an affidavit filed in the district court as part of his second federal habeas proceeding, Johnson states,

I asked [my postconviction attorneys] to file everything they possibly could in my case. I told them I was innocent of this crime and that they should look into the evidence given by the State at my trial and raise that as an

issue in my case. I also told them about Dr. Yarbrough seeing me late at night before my sentencing hearing. I told my lawyers to file a motion for me objecting to what my trial and sentencing lawyers did not do for me. I asked them to raise ineffective assistance of counsel issues in the proper motion.

Supplemental Appendix at 1.

would be contrary to Supreme Court precedent.

█ It has been years since the Supreme Court's delineation of the "actually innocent" exception to the procedural default doctrine. In the context of the sentencing phase of a capital trial, however, we still have no workable definition of the exception, either from the Supreme Court or this court. A workable definition is essential to our jurisprudence because we are often faced with procedurally-defaulted claims, and many petitioners claim they meet this second exception. It is crucial that we know when to apply the exception, so as to limit our interference with the states' criminal justice systems and promote finality while simultaneously recognizing the truly extraordinary case in which a petitioner's claim must be reviewed despite a procedural bar in order to avoid a fundamental miscarriage of justice.[16]

The panel attempted to define the "actually innocent" exception. We reject that definition, however, for reasons which will become apparent. First we must delve a bit deeper into Johnson's allegations regarding why the exception applies here. Next we must describe the panel's holding that those allegations, if true, establish the need to invoke the actually innocent exception and the panel's proposed definition of when a petitioner is actually innocent of the death penalty. Finally, we must propose a workable definition of this exception. In so doing, we will describe why the panel's proposed definition is unacceptable.

1. Johnson's Claim of Ineffective Assistance of Counsel at Sentencing

Johnson alleges his attorneys at sentencing and his court-appointed psychologist failed to conduct a competent investigation of his psychological state. Had they done so, he asserts, they would have discovered psychological problems resulting from a long history of drug abuse and addiction. Johnson contends such an investigation would have enabled sentencing counsel to demonstrate the existence of three statutory mitigating factors, which would have precluded the jury override.[17]

The testimony presented by Johnson's counsel at the sentencing hearing before the advisory jury consisted of the following. A prison official from Tennessee, who had previously been called by the State, was recalled. He testified regarding Johnson's medium security classification in the Tennessee prison system before his escape from that system.[18] Next, sentencing counsel called a local religious leader to testify regarding the morality of the death penalty. The State objected and the judge sustained the objection and refused to allow the witness to testify.[19] Sentencing counsel's principal witness, court-appointed psychologist Ronald Yarbrough, was then called.

Yarbrough had interviewed Johnson the night before for about two and one-half hours.[20] During the interview he conducted several psychological tests, and he later analyzed the results of those tests.[21] From this information, Yarbrough testified, he could "draw some strong hypotheses" regarding Johnson's "behavior in various situations."[22] The psychologist testified that Johnson had a "high average range of intelligence" and "an extremely high level of commonsense," but that if Johnson didn't

---

**16.** The importance of delineating such a procedural rule is amplified since the exception is also available to petitioners who present claims that are an abuse of the writ. *See McCleskey v. Zant,* — U.S. at —, 111 S.Ct. at 1470.

**17.** At two points in his en banc brief Johnson refers to the Supreme Court's decision in *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985). *See* Appellant's En Banc Brief at 13–14 n. 5 & 33. We interpret these references to be an attempt to bolster Johnson's ineffective assistance of sentencing counsel claim and not a separate claim based solely on

*Ake.* The panel, in examining similar references to *Ake* in Johnson's brief to the panel, reached the same conclusion. *See Johnson v. Dugger,* 911 F.2d at 478–79 n. 80.

**18.** Record at 1504–07.

**19.** *Id.* at 1507–08.

**20.** *Id.* at 1510–11.

**21.** *Id.* at 1511–12.

**22.** *Id.* at 1511.

want to apply himself to a task, he wouldn't.[23] Yarbrough believed Johnson to be "in contact with reality," and not schizophrenic or psychotic.[24] He found "no evidence of organic brain damage,"[25] that Johnson probably had problems with authority figures,[26] that he had a good relationship with his family,[27] and that Johnson perceived himself as "cool" and was probably perceived as a leader within his peer group.[28] Finally, Yarbrough opined that Johnson's ability to think and make decisions "deteriorates dramatically" in stressful situations, that in "extremely demanding emotional situation[s Johnson] breaks down his normal mode of thinking, ... decision making ... [and] responding,"[29] but that there was nothing to indicate that on the day of the crime Johnson did not appreciate the criminality of his conduct.[30]

The next witness was Johnson's sister, who testified regarding Johnson's disadvantaged background.[31] Johnson's sister also testified that whatever happened to Johnson would have an effect on her;[32] the final witness, Johnson's daughter, testified to the same effect.[33] The advisory jury and sentencing judge were also of course free to consider the fact that Johnson did not initiate the gun battle, and were free to consider Johnson's counsels' argument at the advisory sentencing hearing (and at the second sentencing hearing before the trial judge) that Johnson's decision to shoot the pharmacist was the product of, among other things, his extreme emotional disturbance after being shot at by Moulton.

Johnson's sentencing counsel made an effort to exclude evidence regarding the details of Johnson's past and his record of violent crime. Counsel made a motion in limine to exclude such evidence, including evidence of Johnson's recent attempted escape from prison.[34] Also, counsel stated that he wished to foreclose impeachment by not relying on character evidence;[35] thus testimony from Johnson's sister was limited to showing his background, not his character.

Johnson now claims that Yarbrough's psychological evaluation was seriously flawed by sentencing counsel's failure to instruct Yarbrough to ask Johnson about his long history of drug abuse (and by implication, Yarbrough's failure to ask Johnson about any history of drug abuse and Johnson's failure to mention that history to Yarbrough during the interview) as well as the failure to conduct any further investigation regarding Johnson's psychological state during the month between the advisory jury hearing and the final sentencing hearing before the trial judge.

Attached to Johnson's second federal habeas petition is an affidavit in which Yarbrough indicates that when he testified he was unaware of Johnson's drug problem or the role that problem played in the murder and robbery. After examining affidavits of friends and family members regarding the severity of Johnson's drug addiction, as well as the affidavit of Dr. Peter Macaluso, an addictionologist who interviewed John-

23. *Id.* at 1513.

24. *Id.* at 1515.

25. *Id.* at 1515, 1522.

26. *Id.* at 1516, 1523.

27. *Id.*

28. *Id.* at 1517.

29. *Id.* at 1520–21, 1524–25.

30. *Id.* at 1525.

31. *Id.* at 1525–26.

32. *Id.* at 1526.

33. *Id.* at 1527–28.

34. Record at 1613–16, 1680–82. The trial judge agreed to exclude evidence of Johnson's escape attempt (which took place while he was being held pending trial). He did so because Johnson had not yet been adjudicated guilty of the attempt.

On January 31, 1979, a jury found Johnson guilty of attempted voluntary escape and battery on a law enforcement officer. Johnson was sentenced to fifteen years on the escape count and five years on the battery count, to be served consecutively. *See* Transcript of Escape and Battery Trial at 146–47.

35. Record at 1613–16 ("We intend to put on no evidence as to the defendant's character for reasons that are obvious").

son, Yarbrough's opinion of Johnson's psychological state is now different. He now believes that at the time of the murder Johnson "was under the influence of a totally controlling, extreme drug addiction,"[36] and that Johnson's "capacity to appreciate the criminality of his behavior or to conform to the requirements of law were [sic] substantially impaired."[37] Also attached to the petition are the affidavits of two doctors (including Dr. Macaluso) who interviewed Johnson in 1988. Their conclusion is similar to that of Yarbrough, that is, that at the time of the murder Johnson was consumed by an overwhelming desire to obtain drugs to feed his drug habit.

2. The Panel Majority's View

Johnson argues, and the panel majority agreed, that if these more recent psychological evaluations are true, they demonstrate that Yarbrough's preliminary conclusions as testified to in the advisory jury sentencing hearing were inaccurate. The panel majority concluded that

[t]his evidence, if true, suggests the existence of three statutory mitigating circumstances under Florida law. *See* Fla. Stat. § 921.141(6)(b) ("The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance."); § 921.141(6)(e) ("The defendant acted under extreme duress or under the substantial domination of another person."); § 921.141(6)(f) ("The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired.").

*Johnson v. Dugger,* 911 F.2d at 462. The panel majority was of the opinion that "were this case before us unencumbered with concerns of procedural default, we

think it is clear that the proffered evidence would support a conclusion that Johnson was prejudiced by his sentencing counsel's failure to develop and present this evidence during sentencing before the trial judge." *Id.* The majority concluded that "there is a high degree of certainty that the sentencing court would not have overridden the jury verdict," *id.*, and that under the *Tedder* standard, "there is a high degree of certainty that the Florida Supreme Court would not have permitted such an override had the evidence now before us been timely presented." *Id.* at 463.

The panel majority considered the meaning of the actually innocent exception. It proposed the following test:

[I]n order to establish a fundamental miscarriage of justice, [a petitioner] must prove that as a result of the alleged constitutional error the sentencing body's deliberative process was affected to such a degree that its ultimate conclusions are probably *factually* in error. In most cases, we envision that this will necessitate proof that as a result of the alleged constitutional error (1) the sentencing body was under a misperception as to the factual background of either the offender or the offense, and (2) but for those factual misperceptions held by the sentencing body, the petitioner probably would not have received a sentence of death.

*Id.* at 468–69 (footnote omitted) (emphasis in original).[38]

The panel majority noted that one method of meeting the actually innocent exception is to establish that absent an alleged constitutional violation, the sentencing body would not have found *any* aggravating factors. The majority "declined to

---

**36.** Petition at 124; Appendix 1 a 4–5.

**37.** *Id.* at 5.

**38.** The panel majority also imagined at least one other scenario where the exception would apply:

We can at least theoretically envision an instance in which a defendant has introduced sufficient evidence to conclusively establish that under no circumstance he or she should be given the death penalty; however, because

of an erroneous instruction or some other unconstitutional factor, the deliberative body is unable to so conclude. Thus, notwithstanding the fact that the factual record is complete, the jury, given the unconstitutional error, *cannot* assess the record appropriately. Such errors, if of sufficient magnitude, would also appear to fall within the scope of the exception as discussed in [*Dugger v.*] *Adams* [489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989)] and *Smith.*
*Id.* at 469 n. 71.

hold, however, that a petitioner *must establish* that the constitutional error implicates *all of the existing aggravating factors* before a federal court should entertain a procedurally defaulted constitutional claim." *Id.* at 469 (emphasis in original).

Applying its newly-developed test to Johnson's case, the panel majority held that an evidentiary hearing is necessary to prevent a potential fundamental miscarriage of justice. Johnson, the majority decided, has "proffered evidence which if true would establish that he was probably actually innocent of the death sentence." *Id.* at 477. The dissenting judge offered quite a different view of what it means to be actually innocent of the death penalty, a view with which we agree.[39]

3. The Death Penalty Prior to *Furman v. Georgia*

The Supreme Court's treatment of the relationship between sentencing discretion, the death penalty, and the Eighth Amendment has resulted in an almost perfect jurisprudential circle.[40] Prior to *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), many states authorized the death penalty for any defendant found guilty of what we reluctantly refer to as "simple murder." The death penalty was not mandatory; the jury or other sentencing authority had unlimited discretion to grant the defendant mercy and impose life imprisonment rather than the death penalty. The Supreme Court unequivocally denounced such discretion in *Furman*, concluding that unguided sentencing led to the discriminatory, arbitrary, and capricious imposition of the death penalty in violation of the Eighth Amendment. In short, the Court found no merit in discretion.

At least thirty states enacted new death penalty statutes in response to *Furman*'s concern for unguided discretion. One group of states interpreted *Furman* to require the removal of *all* discretion in the capital sentencing context. These states passed laws that *mandated* the death penalty for certain statutorily defined crimes. The other group of states opted to provide guided discretion in the sentencing process by listing certain statutorily defined aggravating and mitigating circumstances. These latter states undertook to confine the sentencing body's discretion within the statutory factors.

The Supreme Court reviewed these two distinct types of statutes during the same term in 1976 and struck down mandatory death penalty statutes,[41] but upheld statutes that provided for discretion.[42] Limited discretion, according to the Court, was both consistent with, and necessary to, the constitutional requirement of an individualized evaluation of the death penalty's appropriateness. So began the arc back toward discretion. The *Furman* Court announced a retreat from discretion in capital sentencing; in *Woodson, Roberts, Gregg, Proffitt* and *Jurek*, that retreat arched backward toward a constitutional appreciation of discretion.

---

**39.** The discussion of what it means to be actually innocent of the death penalty, contained in sections IV.B.3, B.4, B.5 and most of section IV.B.6 of this opinion, is taken directly from the dissenting opinion, with only minor changes. *See Johnson v. Dugger,* at 483–491 (Hill, J., dissenting). Indeed, many paragraphs are simply transcribed verbatim; we omit quotation marks for easier readability.

**40.** *See Penry v. Lynaugh,* 492 U.S. 302, 360, 109 S.Ct. 2934, 2969, 106 L.Ed.2d 256 (1989) (Scalia, J., concurring in part and dissenting in part) ("the Court has come full circle, not only permitting but requiring what *Furman* once condemned").

**41.** *See Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976) (mandatory

death penalty statute unconstitutional); *Roberts v. Louisiana,* 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974 (1976) (same).

**42.** *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976) (upholding guided discretion statute that requires the establishment of certain aggravating circumstances); *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (upholding guided discretion statute that requires establishment of certain aggravating circumstances and a balancing of circumstances); *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929 (1976) (upholding guided discretion statute that includes, among other factors, future dangerousness in the determination of whether to impose death).

In *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), the Court did not merely tolerate discretion, but mandated it! Death penalty statutes following *Furman* had apparently confined the exercise of discretion "at both ends." These statutes generally required the sentencing authority to consider certain *statutorily specified* aggravating circumstances and *statutorily specified* mitigating circumstances found to accompany the murder. The trial court in *Lockett* had apparently concluded that to allow consideration of claimed mitigating circumstances not in the statute would authorize the type of unbridled discretion condemned in *Furman*. The Supreme Court held, however, that the Constitution requires states to afford the sentencing authority the discretion to consider *any* circumstances claimed to be mitigating, whether encompassed in the statute or not. Thus, the Court constitutionally imposed unbridled discretion in the grant of mercy. It appeared, however, that the Court may have left the consideration of aggravating circumstances to those prescribed in the various state statutes.

The Court then "dropped the other shoe." In *Barclay v. Florida*, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983) and *Zant v. Stephens*, 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), the Court revealed its appreciation of the fact that a defendant is guilty of a murder for which the death penalty could be imposed where it is found that the murder was accompanied by one or more of the statutory aggravating circumstances. Thus, the *capital* crime is not murder; it may be called aggravated murder or capital murder. Once convicted of such a crime, not only can unlimited mitigating circumstances as per *Lockett* be shown, but the state can prove facts in aggravation of the capital crime, whether listed as statutory aggravating circumstances or not.

### 4. The Death Penalty Today: "Aggravated Murder"

Prior to *Furman*, the sentencing authority in a murder case had unfettered discretion to consider virtually anything asserted in mitigation. *Lockett* re-established that practice. Prior to *Furman*, the sentencer in a capital case could consider anything, in its unfettered discretion, in aggravation. *Barclay* and *Zant* have re-established this practice so long as at least one statutory aggravating circumstance accompanies the murder. In practical terms, the Court has reinvigorated discretion in capital sentencing in order to guarantee an individualized sentencing process.

Engineers and surveyors use the phrase "failure to close" to express the idea that one has measured from a known reference point to certain unknown points without returning to the original reference point. This expression aptly describes the historical progression of death penalty jurisprudence. Shortly after *Lockett*, we noted the "inherent tension" between the Court's aspiration for "individualized sentencing and objective standards." *Moore v. Balkcom*, 716 F.2d 1511, 1521 (11th Cir.1983). Justice Scalia has recently denounced this tension as internally contradictory. *Walton v. Arizona*, —— U.S. ——, ——, 110 S.Ct. 3047, 3051–52, 111 L.Ed.2d 511 (1990) (Scalia, J., concurring in part).[43]

The Court seems to have resolved the tension by making one full turn on a "coil spring" or a "spiral staircase" of case law. The Court has returned the law largely to its pre-*Furman* state but has ratcheted the doctrine up one step from its starting point. Prior to *Furman*, "simple murder" was a capital crime. Today the level of criminal conduct for a capital crime has been raised; a defendant must commit the new crime of "capital murder" or "aggravated murder" in order to be eligible for the death penalty. This new crime is defined as "murder accompanied by one or more of the statutory aggravating circum-

---

**43.** Justice Scalia argues that *Lockett* "completely exploded whatever coherence the notion of 'guided discretion' once had," *Walton*, —— U.S. at ——, 110 S.Ct. at 3061, and notes that "[to] acknowledge that there perhaps is an inherent tension ... is rather like saying that there was perhaps an inherent tension between the Allies and the Axis Powers in World War II," *id.* at ——, 110 S.Ct. at 3063 (internal quotation marks omitted).

stances." The sentencing authority may not impose the death penalty for "simple murder." The essential point of this development in the law, at least with regard to Johnson's claim of actual innocence, is that when the prosecution has proved that the defendant committed aggravated murder, the sentencing authority has very broad discretion to sentence the defendant either to life imprisonment or the death penalty.

■ Because Johnson's proposed showing of factual error does not cast doubt on his guilt of a crime for which the sentencing authority in his case could impose the death penalty (i.e., "murder accompanied by at least one statutory aggravating circumstance"), he has not made a colorable showing of actual innocence. Therefore, Johnson is not entitled to a review on the merits of his defaulted constitutional claim.

### 5. The "Eligibility" Test for Actual Innocence

The Supreme Court has not told us what it means to be actually innocent of the death penalty. In *Murray v. Carrier*, 477 U.S. 478, 495–96, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986), a majority of the Court held that "where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default."[44] This statement expresses a fundamental tenet of our administration of criminal law: "an innocent person ... in custody or in jeopardy of the execution of a death sentence [must have unlimited opportunities] to repair to a court of justice for relief." *Gunn v. Newsome*, 881 F.2d 949, 966 (11th Cir.) (Hill, J., dis-

senting), *cert. denied*, —— U.S. ——, 110 S.Ct. 542, 107 L.Ed.2d 540 (1989).

In *Smith v. Murray*, 477 U.S. 527, 537, 106 S.Ct. 2661, 2666, 91 L.Ed.2d 434 (1986), the Court acknowledged the difficulties in translating the concept of "innocence" from the guilt phase of a capital trial to the sentencing context. The *Smith* Court also reiterated that, even in the sentencing context, courts must continue to distinguish between actual, as distinct from legal, innocence. *Smith*, 477 U.S. at 537, 106 S.Ct. at 2666. A more recent majority of the Court expressly reaffirmed that the actual innocence test limits a federal habeas court's authority to reach the merits of defaulted claims for which a petitioner cannot demonstrate cause. *Dugger v. Adams*, 489 U.S. 401, 410 n. 6, 109 S.Ct. 1211, 1217–18 n. 6, 103 L.Ed.2d 435 (1989).

In both *Smith* and *Adams*, as in the present case, the Court considered allegations that constitutional errors led to factual inaccuracies in the sentencing process. In *Smith* the Court considered the importance under the actual innocence standard of certain highly prejudicial statements made by the defendant to his court-appointed psychiatrist. The trial court admitted these statements at Smith's sentencing in violation of Smith's Fifth and Sixth Amendment rights. Like Johnson, Smith had defaulted on these claims. The Court found that the alleged error did not concern a factual inaccuracy in the sentencing process since the inadmissible evidence was both probative and reliable.

The panel majority attempted to distinguish *Smith* by noting that Johnson's allegations of error do in fact involve claims of factual inaccuracies. *Johnson v. Dugger*, 911 F.2d at 467–68.[45] The panel majority

**44.** The *Carrier* Court made clear the "actual innocence" test defines the limits of federal habeas jurisdiction to review defaulted claims. *Carrier*, 477 U.S. at 493–94, 106 S.Ct. at 2646–47.

**45.** Even if we agreed with the panel majority's characterization of the potential value to Johnson of introducing his proffered psychiatric evidence, we could not agree that the failure to present such evidence resulted in the admission of false "facts" and "precluded" the development of true "facts." *See Johnson v. Dugger*, 911 F.2d at 475. First, even assuming *arguendo* that the

sentencing attorneys did not exercise reasonable professional judgment in failing to apprise Dr. Yarbrough adequately regarding Johnson's prior involvement with drugs, or to pursue this theory after the jury recommended life, it seems odd to say that the error "precluded" the development of true facts. We think it fair to presume that Dr. Yarbrough knew that Johnson was convicted for killing a person in the course of robbing a drugstore for drugs, and that the attorneys could expect an examining psychologist, who was at the time and still is an expert in

ignored the "critical role" that the alleged constitutional error in *Smith* "played . . . in the determination that death [was] an appropriate penalty"; that error, in fact, "made the difference between life and death in the jury's consideration of [Smith's] fate." *Id.* 477 U.S. at 539, 106 S.Ct. at 2669 (Stevens, J., dissenting). The Court assumed that Smith was "legally innocent"—that if the trial court had properly suppressed his statements the sentencing body probably would have imposed life imprisonment rather that the death penalty. The Court nevertheless held that the claim was "unrelated to [actual] innocence." *Id.* at 539, 106 S.Ct. at 2668. The sentencing body in *Smith* would have remained free, even if the trial court had excluded Smith's statements, to impose the death penalty; thus Smith's claim of error did not implicate his actual innocence of the death penalty.

█ In other words, although factual inaccuracy in the guilt or sentencing context may well be *necessary* to a claim of actual innocence, factual inaccuracy is not *sufficient* unless the inaccuracy demonstrates, at least colorably, that the petitioner is actually innocent, or ineligible for, either an adjudication of guilt or the sentence imposed. If prejudicial factual inaccuracy alone is enough to warrant review of a defaulted claim, then the actual innocence standard is meaningless.

█ *Dugger v. Adams* also illustrates this point. In that case, the Court rejected the petitioner's claim that an alleged *Caldwell* error established a colorable showing of actual innocence. *See Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The petitioner asserted that the trial judge violated the Eighth Amendment when he mistakenly advised the jury that its sentencing recommenda-

tion was merely advisory. The statements purportedly misled the jury regarding its role in the capital sentencing process under Florida law. The *Adams* majority acquiesced in the view (expressed in Justice Blackmun's dissent) that the alleged *Caldwell* error did not concern merely "the [erroneous] inclusion or exclusion of particular evidence"; the error was "global in scope" and pervasive in its tendency to influence the jury's recommendation. *Adams,* 489 U.S. at 423, 109 S.Ct. at 1224 (Blackmun, J., dissenting). Rather than refute the dissent's characterization of the facts, the majority instead expressly rejected the idea that "a fundamental miscarriage of justice results whenever 'there is a substantial claim that the constitutional violation undermined the accuracy of the sentencing decision.'" *Id.* at 410 n. 6, 109 S.Ct. at 1217–18 n. 6 (quoting Blackmun, J., dissenting, *id.* at 415, 109 S.Ct. at 1219 n. 4). Because, as in the case at hand, the sentencing body was free to impose death penalty despite the alleged error—regardless of whether it would have done so in the absence of the error—the claim did not implicate Adams's actual innocence of the death penalty.

As we have previously noted, the Supreme Court has not expressly defined actual innocence in the context of the death sentence. *Id.* at 410 n. 6, 109 S.Ct. at 1217–18 n. 6. In the guilt phase of a trial, a defendant is innocent of the crime if, under the alleged facts, he or she is not eligible for an adjudication of guilt. "Actual eligibility" and "legal eligibility" are distinct; a defendant is innocent of a crime only if he is ineligible for an adjudication of guilt—either by virtue of a (correct or incorrect) finding of innocence, or through objective facts that prove that a guilty verdict was wrong because the defendant did

---

the field of drug abuse (*See* Appendix to Petition for Writ of Habeas Corpus 1 at 5 (affidavit of Ronald Yarbrough)), *to have inquired into the patient's involvement with drugs.* Second, neither the judge nor the jury would be required to find that the speculative opinion testimony proffered by Johnson today establishes as a matter of law either the statutory or nonstatutory mitigating circumstances suggested by the panel majority. *See id.* at 477. Finally, and most importantly, the Supreme Court has made clear that

courts must apply the "admission of false facts/preclusion of true facts" test to determine whether the defendant is *actually,* not *legally,* innocent of the crime charged or sentence imposed. Thus, even if one could characterize Johnson's new psychological evidence as having caused the admission of false "facts" or "precluded" the admission of true "facts," such evidence *suggests prejudice, not "actual innocence."*

not commit each and every element of the crime charged.

A properly convicted defendant's claim to innocence in the sentencing context is likewise tied to eligibility. A convicted defendant is eligible for any punishment within the discretion the legislature accords the sentencing body. One cannot say that the defendant is innocent of the sentence imposed if the defendant actually committed the necessary acts that would make him eligible for the particular punishment chosen. Even if the guilty defendant can demonstrate that a constitutional error led to a factual inaccuracy—which in turn prejudiced the outcome of the sentencing body's deliberative process—the defendant is not innocent of the sentence imposed.

The somewhat narrower scope of innocence in the sentencing phase of a trial, as compared to the guilt phase, results from the unique role that discretion plays in sentencing. The discretionary nature of sentencing necessarily reduces the objective criteria by which a court may determine that a particular sentence is wrong or unauthorized. Only under very limited circumstances is a court competent to determine that a defendant is ineligible for a particular sentence despite the sentencing body's decision to the contrary. In the guilt phase of a trial, innocence and guilt have an objective existence that a court may under certain circumstances discern— either at trial or in a collateral proceeding. The petitioner may assert new facts (or improperly excluded facts) with regard to guilt, and a court may determine that, given those facts, a finding of guilt was unauthorized.

At sentencing, by contrast, there are few "elements" necessary for a particular sentence. A showing that an erroneous factual premise probably influenced the sentencing body does not *necessarily* mean that the defendant is innocent or ineligible for the sentence imposed. Only under very limited circumstances may a court deter-

mine that a factual showing demonstrates the defendant's ineligibility for the sentence imposed in light of purportedly inaccurate or incomplete facts. The sentenced defendant must demonstrate not merely that the error affected the sentencing outcome, but that the error resulted in a sentencing outcome for which the defendant is not eligible by virtue of his conduct.

In the capital sentencing context, the defendant becomes eligible for the death sentence only if the sentencing body *correctly* finds that he has committed a crime for which the sentencing body *could*, in its discretion, sentence him to death. Thus, a petitioner may make a colorable showing that he is actually innocent of the death penalty by presenting evidence that an alleged constitutional error implicates *all* of the aggravating factors found to be present by the sentencing body. That is, but for the alleged constitutional error, the sentencing body *could not* have found *any* aggravating factors and thus the petitioner was ineligible for the death penalty. In other words, the petitioner must show that absent the alleged constitutional error, the jury would have lacked the discretion to impose the death penalty; that is, that he is *ineligible* for the death penalty.[46]

### 6. The Panel Majority's "Actual Prejudice" Test

The panel majority attempted to articulate a test to determine whether a constitutional error has skewed a "sentencing body's deliberative process ... to such a degree that its ultimate conclusions are probably factually in error." *Johnson v. Dugger*, 911 F.2d at 468 (emphasis omitted). Asking the wrong question necessarily begets the wrong answer. When a defendant is eligible for the death penalty (by virtue of having committed first-degree murder accompanied by at least one statutory aggravating circumstance), it is nearly impossible to determine that the sentencing body's ultimate conclusion that imprison-

---

**46.** We suppose a petitioner might also be able to make a colorable showing of actual innocence by demonstrating that but for an alleged constitutional error, the sentencing body would have been *compelled* to choose life imprisonment instead of the death penalty. This case does not present such a situation.

ment is more appropriate than the death penalty (or *vice versa*) is "correct" or "accurate," or "incorrect" or "inaccurate."

The nature of the question asked by the panel majority illustrates its misinterpretation of the "actual" or "factual" innocence standard. Although factual errors can undermine the factual premises from which the sentencing body reaches its ultimate conclusion, one can never say that the ultimately discretionary choice by the sentencing body is "factually in error." Other than in the context of a general proportionality review, a court lacks objective criteria by which to divine that it is "factually incorrect" to sentence a particular death-eligible defendant to death, or to life imprisonment instead. So long as the jury could have imposed the death penalty, there can be no "correct" or "incorrect" sentencing outcome.

It is, however, possible to determine that a constitutional error led to a factual error, and that the factual error probably influenced the sentencing body to select the death penalty. In fact, courts often define "prejudicial error" in just this fashion. It is within Congress' power to enable federal courts to review these errors in habeas proceedings, regardless of a litigant's procedural default or of an abuse of the writ. The Supreme Court has interpreted habeas jurisdictional statutes to require, in such defaulted or abusive cases, more than prejudicial error. The Court reached this conclusion in light of certain expressions of congressional intent and a serious concern for comity and finality.

The panel majority attempted to distinguish its test from the ordinary test for prejudice. The majority was correct that the Supreme Court has admonished courts to apply the test for "actual innocence" in light of *all* probative evidence, including evidence that was admitted (or excluded) as a result of constitutional error. *See Kuhlmann v. Wilson*, 477 U.S. 436, 454 n. 17, 106 S.Ct. 2616, 2627 n. 17, 91 L.Ed.2d 364 (1986) (citing Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U.Chi.L.Rev. 142, 160 (1970)); *Smith v. Murray*, 477 U.S. at 538,

106 S.Ct. at 2668. We recognize that the panel majority applied its test in light of *all* probative evidence. Our concern is that the panel majority's test seeks to answer the wrong question. The panel majority's test asks whether, but for a factual misimpression with regard to aggravation or mitigation, the sentencing body probably would have exercised its discretion in a different manner. The Supreme Court has made clear that the question is whether, in light of all probative evidence, including evidence that was or was not admitted as a result of the alleged constitutional error, the petitioner has made a colorable showing that he has suffered a conviction or received a punishment that the adjudicator of guilt or the sentencing body was not free to impose under the actual facts.

In answering what is a wrong and an unanswerable question, the panel majority propose a test that equates "correctness" or "accuracy" of sentence with a deliberative process free from factual errors that affect the exercise of discretion. According to the panel majority, if the petitioner makes a colorable showing of the following, he is entitled to a hearing on the merits of his claim—regardless of an unexcused procedural default or an abuse of the writ:

(1) the sentencing body was under a misperception as to the factual background of either the offender or the offense, and
(2) but for those factual misperceptions held by the sentencing body, the petitioner probably would not have received a sentence of death.

*Johnson v. Dugger*, 911 F.2d at 468–69.

The panel majority's test has only a slight bearing on the petitioner's "innocence" of the sentence imposed. It instead looks to the purity of the deliberative process and grants relief for errors that probably affected the outcome. The panel majority held that a petitioner is "guilty" of the death penalty only if the process by which he received that sentence is absolutely free from any omissions or presentations of fact that probably influenced the sentencing body's exercise of discretion. Conversely, a petitioner is actually innocent of

the death penalty, according to the panel majority, if any "factual" error with regard to aggravation or mitigation probably influenced the deliberative process. In short, the panel majority sets forth a roughly accurate description of the standard for evaluating the significance of a *timely raised* allegation of constitutional error in connection with the sentencing process.[47]

Aside from being wrong, the panel majority's test is an undesirable one for several reasons. The test is fundamentally offensive to both comity and finality. It requires a federal court to review the merits of a claim whenever an alleged constitutional error probably influenced the sentencing body to impose the death penalty even though a claim is procedurally defaulted, constitutes an abuse of the writ, or is barred under both doctrines. Thus, the panel majority's test abolishes the distinction between a petitioner's first federal habeas petition and all subsequent such petitions. It matters not, under the panel majority's test, that a petitioner is filing his second, third, fourth, or even tenth federal habeas petition. If he can make out a colorable claim of "actual prejudice," he is entitled to have the merits of his claim reviewed. Were this Johnson's first federal habeas petition, he would have to allege and prove both that the performance of his counsel at sentencing was deficient, and that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington,* 466 U.S. 668, 694, 104 S.Ct. 2052, 2068, 80 L.Ed.2d 674 (1984). Under the panel majority's test, Johnson need prove no more even though his claim is procedurally defaulted or abusive or both.

The test creates the necessity of holding an evidentiary hearing for the first time in federal court on a claim the petitioner should have presented to a state court long ago. Were we to remand this case, as the panel majority held we should, a federal district court would hear evidence a state court never had the opportunity to hear and evaluate. The panel majority's assertion that its test is reserved for extraordinary cases is of little comfort. This case demonstrates that the panel majority's test "turn[s] the case in which an error results in a fundamental miscarriage of justice, the 'extraordinary case,' . . . into an all too ordinary one." *Adams,* 489 U.S. at 410 n. 6, 109 S.Ct. at 1217–18 n. 6. Johnson's claim is a common one. He claims that his counsel did a poor job—they could have done better, and if they had, he probably would not have received the death penalty. We are faced with similar claims in many capital cases. Thus, the panel majority's test would require evidentiary hearings in many not-so-extraordinary cases.

Lastly, the panel majority's test encourages and rewards "sandbagging." Johnson's habeas counsel admitted they filed first in federal court because they believed they could always go back to state court later. In part, the procedural default doctrine is designed to prevent such practices. *Wainwright v. Sykes,* 433 U.S. 72, 89, 97 S.Ct. 2497, 2508, 53 L.Ed.2d 594 (1977). The panel majority's test allows petitioners to circumvent the procedural default doctrine and the policy against intentionally withholding claims all too easily.

7. Is Johnson Actually Innocent of the Death Penalty?

██ The excluded evidence does not implicate any of the four aggravating factors found by the trial judge and upheld by the Supreme Court of Florida. Johnson, therefore, was convicted of murder accompanied by at least one aggravating factor. Further, the introduction of the now proffered evidence would not have deprived the sentencing judge of the discretion to impose

---

**47.** The panel majority's heavy reliance on *Porter v. Wainwright,* 805 F.2d 930, 936 (11th Cir. 1986), and similar cases, *see Johnson v. Dugger,* 911 F.2d at 462, makes clear that it seeks to replace the Supreme Court's actual innocence test with the standard presently used to determine prejudice in the sentencing context. *Porter* did *not* involve either a procedural default or an abuse of the writ, both of which the panel majority conceded are present in this case. In simple terms, *Porter* explains the method by which a court determines whether a petitioner is entitled to relief for a constitutional error that is *timely asserted* (or an untimely assertion of error for which a sufficient legal excuse exists).

the death penalty. The panel majority uncritically accepted Johnson's claim that the proffered evidence, if true, would have been considered a mitigating factor by the advisory jury and trial judge. We disagree. There is a very real possibility that both the jury and the judge might not have accepted the drug compulsion theory as a mitigating factor, but instead would have considered Johnson's propensity toward violent crime—whether or not the product of a drug addiction—as a nonstatutory *aggravating* circumstance. Even if the evidence would have established the existence of statutory mitigating circumstances, however, we nevertheless conclude that Johnson has not satisfied the actually innocent exception to the procedural default doctrine. In other words, Johnson has not shown that the trial judge was not free to sentence Johnson to death. We hold that Johnson has not made a colorable showing that he is actually innocent of the death penalty and we should not, therefore, exercise our discretion to review the merits of his ineffective assistance of counsel at sentencing claim.

## V.  ABUSE OF THE WRIT

Because we conclude that Johnson's ineffective assistance of counsel at sentencing claim is procedurally barred, we need not decide whether the claim is also an abuse of the writ.

## VI.  JOHNSON'S OTHER CLAIMS

The district court rejected on the merits both Johnson's *Hitchcock* claim and his claim that appellate counsel was ineffective. We find no error in those determinations. The district court concluded that Johnson's jury override claim was an abuse of the writ. We agree with the panel majority's conclusion that the claim is successive and that no exception to the abuse of the writ doctrine requires us to address the

merits of that claim. Finally, the district court determined that Johnson's ineffective assistance of trial counsel claim is procedurally barred. Again, we agree with the panel majority that the claim is procedurally defaulted and that no exception to the procedural default doctrine requires us to reach the merits of that claim.

## VII.  CONCLUSION

The judgment of the district court denying Johnson's petition for a writ of habeas corpus is AFFIRMED.

TJOFLAT, Chief Judge, concurring in part, dissenting in part:

We took this case en banc to decide whether a fundamental miscarriage of justice will occur[1] if we enforce the abuse of the writ and state procedural default doctrines and refuse to entertain the petitioner's claim that his counsel rendered ineffective assistance at his sentencing hearing.[2] The court now holds that to demonstrate a fundamental miscarriage of justice, the petitioner "must show that absent the alleged constitutional error, the jury would have lacked the discretion to impose the death penalty; that is, he is *ineligible* for the death penalty." *Ante* at 1183. Applying this test, the court concludes that no fundamental miscarriage of justice will occur if we refuse to entertain the petitioner's claim because he failed to show that, but for the ineffectiveness of his counsel, the jury would have found no statutory aggravating circumstance to support his death sentence. In my opinion, the court correctly posits an "eligibility" test for a federal habeas court to use in judging when a fundamental miscarriage of justice will occur by its refusal to entertain a claim. By concentrating solely on the existence of statutory aggravating circumstances, however, the court limits this test in a manner

---

1. In considering whether a fundamental miscarriage of justice will occur if we do not entertain the petitioner's ineffective assistance of counsel claim, we must assume the truth of the facts alleged in the petitioner's habeas petition. In particular, we accept as reliable the evidence of mitigating circumstances he proffers. *Porter v. Wainwright*, 805 F.2d 930, 933 (11th Cir.1986).

2. I concur in parts I, II, III, and VI of the court's opinion. As the opinions filed today demonstrate, the court agrees, unanimously, that the district court properly rejected the petitioner's other claims for habeas relief.

that is unfaithful to Supreme Court precedent. As I explain below, I conclude that the petitioner has demonstrated that our failure to entertain his claim will result in a fundamental miscarriage of justice—absent the alleged constitutional error, the trial judge, as a matter of law, could not have sentenced the petitioner to death.

## I.

On December 8, 1978, a jury convicted the petitioner of first-degree murder and robbery. The next day, following a hearing, the same jury recommended that the petitioner be sentenced to life imprisonment. One month later, the trial judge, following a sentencing hearing at which the State and the petitioner had the opportunity to present aggravating or mitigating evidence, overrode the jury's recommendation of life imprisonment and sentenced the petitioner to death. On appeal, the Florida Supreme Court unanimously affirmed the petitioner's convictions and, by a vote of four to three, affirmed his death sentence. *See Johnson v. State*, 393 So.2d 1069 (Fla. 1980), *cert. denied*, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981).

On May 12, 1982, the petitioner filed his first petition for a writ of habeas corpus in the United States District Court for the Northern District of Florida. The district court denied this petition, and we affirmed.

*See Johnson v. Wainwright*, 806 F.2d 1479 (11th Cir.1986), *cert. denied*, 484 U.S. 872, 108 S.Ct. 205, 98 L.Ed.2d 157 (1987). On March 10, 1989, the petitioner filed his second federal habeas corpus petition, the one at issue here; in this petition he claimed, for the first time in federal court, that his counsel had rendered ineffective assistance by failing to investigate fully his mental health and present to the sentencing judge the mitigating evidence this investigation would have disclosed.

The State, in response, argued, in part, that this ineffective assistance of counsel claim constituted an abuse of the writ; alternatively, the State contended that the petitioner had procedurally defaulted this claim in state court and, hence, could not raise it on federal habeas corpus.[3] The district court dismissed the petitioner's second petition; with regard to the ineffective assistance of counsel claim, the court held that "even assuming that this claim is not subject to Rule 9(b) [abuse of the writ] dismissal, it is procedurally defaulted through the petitioner's failure to raise it in a [Fla.R.Crim.P.] 3.850 motion in a timely fashion."

This case, then, first and foremost, involves an abuse of the writ: the petitioner raised a claim for the first time in a second federal habeas petition.[4] In such cases, federal courts generally should dismiss the

3. Before bringing the instant petition, the petitioner moved for post-conviction relief in the state trial court, pursuant to Florida Rule of Criminal Procedure 3.850. In this motion, he raised, *inter alia,* the ineffective assistance of counsel claim at issue here. The court dismissed the petitioner's motion, holding that it was untimely—having been brought after the applicable two-year limitation period had expired. *See* Fla.R.Crim.P. 3.850. The Florida Supreme Court agreed that this motion was time barred and affirmed. *Johnson v. State,* 536 So.2d 1009, 1011 (Fla.1988).

4. As noted above, two procedural barriers might prevent us from entertaining the petitioner's ineffective assistance of counsel claim: (1) an abuse of the writ and (2) a state procedural default. The court, in examining this claim, first inquires whether we should excuse the petitioner's state procedural default. In my view, we should first examine whether to excuse the petitioner's abuse of the writ; only after this inquiry, if the petitioner demonstrates that we should excuse his abuse of the writ, should we

entertain his request to excuse his state procedural default. In this way, as I explain below, we minimize federal intrusion into state criminal proceedings.

The abuse of the writ doctrine is designed to reduce the burden on federal courts, which are scarce dispute-resolution resources. The doctrine focuses on the petitioner's conduct in federal court; it requires the district court, when faced with a new claim in a successive habeas petition, to ask the petitioner why he did not present the claim in his first petition. How the state courts may have handled the petitioner's claim is irrelevant; hence, the district court's examination of the petitioner's conduct in federal court poses no threat to the integrity of the state's criminal procedures. *See McCleskey v. Zant,* — U.S. —, —, 111 S.Ct. 1454, 1468, 113 L.Ed.2d 517 (1991) ("respect for the integrity of procedures 'employed by a coordinate jurisdiction within the federal system' ... is not implicated when a petitioner defaults a claim by failing to raise it in the first round of federal habeas review" (citation omitted) (quoting

claim without addressing its merits. *See* 28 U.S.C. § 2244(b) (1988); *id.* § 2254 Rule 9(b); *see also McCleskey v. Zant,* —— U.S. ——, ——, 111 S.Ct. 1454, 1461–71, 113 L.Ed.2d 517 (1991) (explaining history of abuse of the writ doctrine). When, however, a petitioner can demonstrate "cause" for his abuse of the writ and prejudice resulting from it, a federal court may excuse the abuse and reach the merits of the claim. *See McCleskey,* —— U.S. at ——, 111 S.Ct. at 1468. Furthermore, even if the petitioner cannot satisfy this cause-and-prejudice standard, a federal court, in an extraordinary case, may excuse the abuse of the writ if failure to consider the claim will result in a "fundamental miscarriage of justice." *Id.* at ——, 111 S.Ct. at 1468. We, thus, must analyze this case to determine whether the petitioner's abuse of the writ is excusable.

### A.

It is clear that the petitioner is unable to demonstrate cause to excuse his abuse of the writ. The Supreme Court reiterated in *McCleskey,* —— U.S. at ——, 111 S.Ct. at 1470–74, that the "[a]buse of the writ [doctrine] examines *petitioner's* conduct: the question is whether petitioner possessed, or

*Wainwright v. Sykes,* 433 U.S. 72, 88, 97 S.Ct. 2497, 2507, 53 L.Ed.2d 594 (1977))). The procedural default doctrine, on the other hand, which the court invokes here, focuses on the petitioner's behavior in a "coordinate jurisdiction within the federal system"—the state court—in failing to abide by that jurisdiction's procedural rules; the doctrine requires federal courts to honor the state's enforcement of those rules as an independent and adequate procedural ground for rejecting a petitioner's claim. *See, e.g., Reed v. Ross,* 468 U.S. 1, 10, 104 S.Ct. 2901, 2907, 82 L.Ed.2d 1 (1984) ("[T]he State's interest in the integrity of its rules and proceedings ... would be undermined if the federal courts were too free to ignore procedural forfeitures in state court."); *see also Sykes,* 433 U.S. at 88–90, 97 S.Ct. at 2507–08.

Thus, with the rare claim that is barred both by the abuse of the writ doctrine and the state procedural default doctrine, we must, contrary to the court's approach today, avoid exacting an unnecessary price on the state's criminal justice system by analyzing whether to excuse the abuse of the writ first; only if the abuse of the writ is excusable should we interfere with the state's system by questioning whether to honor its legitimate procedural rules.

by reasonable means could have obtained, a sufficient basis to allege a claim in the first petition and pursue the matter through the habeas process." The petitioner, in an affidavit submitted along with his second federal habeas petition, revealed the following:

> Mr. Parnham and Mr. Hammons [his first post-conviction counsel in both the state and federal courts] visited me at the prison at various times. I didn't know a lot about the legal proceedings but I asked them to file everything they possibly could in my case. I ... told them about Dr. Yarbrough [the psychiatrist who examined him] seeing me late at night before my sentencing hearing. I told my lawyers to file a motion for me objecting to what my trial and sentencing lawyers did not do for me. I asked them to raise ineffective assistance of counsel issues in the proper motion.

Thus, the petitioner was aware of the claim at issue when he filed his first federal habeas petition. There is, then, no justification for his failure to bring this claim in that petition.[5]

### B.

The petitioner's failure to demonstrate cause to excuse his abuse of the writ, how-

5. The petitioner argues that his collateral counsel, by failing to follow his clear instructions, rendered ineffective assistance and that this ineffectiveness is cause to excuse his abuse of the writ. Even if these attorneys' performance is relevant, it does not suffice as cause to excuse his abuse of the writ. The Supreme Court has held that "[i]n the absence of a constitutional violation, the petitioner bears the risk in federal habeas for all attorney errors made in the course of representation." *Coleman v. Thompson,* —— U.S. ——, ——, 111 S.Ct. 2546, 2552, 115 L.Ed.2d 640 (1991). When counsel's ineffectiveness does not amount to a constitutional violation, the petitioner is unable to demonstrate that an objective factor external to his defense caused his abuse of the writ. *Id.; see also McCleskey,* —— U.S. ——, 111 S.Ct. at 1454. The petitioner in this case could not show that his collateral attorney's behavior in federal court—in failing to raise the ineffective assistance of counsel claim in his first habeas petition—was an independent constitutional violation. There simply is no constitutional right to counsel on federal habeas corpus. *Pennsylvania v. Finley,* 481 U.S. 551, 555, 107 S.Ct. 1990, 1993, 95 L.Ed.2d 539 (1987).

ever, does not end our inquiry. We must determine whether our failure to hear this abusive claim will result in a fundamental miscarriage of justice. As I explain below, in subpart 1, this requires us to determine whether the petitioner, absent the alleged constitutional error, would have been eligible, as a matter of federal or state law, for the death sentence he received. After developing the proper standard to evaluate this issue, I conclude, in subpart 2, that our failure to entertain the petitioner's claim will result in a fundamental miscarriage of justice—but for his sentencing counsel's ineffectiveness, the trial judge would have been obligated, as a matter of law, to accept the jury's recommendation of life imprisonment.

### 1.

As I state above, federal courts will usually excuse an abuse of the writ only if the petitioner can demonstrate cause for the abuse and prejudice resulting from it. In some cases, however, "victims of a fundamental miscarriage of justice" might not be able to "meet the cause-and-prejudice standard." *Murray v. Carrier*, 477 U.S. 478, 495–96, 106 S.Ct. 2639, 2649, 91 L.Ed.2d 397 (1986). In those cases, a federal court may excuse the abuse of the writ despite the petitioner's failure to demonstrate cause for his abuse. *McCleskey*, —— U.S. at ——, 111 S.Ct. at 1468–71. The Supreme Court enunciated the following principle to aid federal courts in recognizing these exceptional cases: "in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause." *Carrier*, 477 U.S. at 496, 106 S.Ct. at 2649;

see also *McCleskey*, —— U.S. ——, 111 S.Ct. at 1468–71. The Court has made clear that this principle also applies to claims of alleged constitutional error in sentencing. *Smith v. Murray*, 477 U.S. 527, 537–39, 106 S.Ct. 2661, 2668–69, 91 L.Ed.2d 434 (1986).

Federal courts, then, may apply the fundamental miscarriage of justice exception only when the petitioner augments his constitutional claim with a showing of actual innocence. Actual innocence is not, on its face, a completely clear concept, even in the guilt/innocence context. The best guidance to its meaning comes from the plurality opinion in *Kuhlmann v. Wilson*, 477 U.S. 436, 454, 106 S.Ct. 2616, 2627, 91 L.Ed.2d 364 (1986). In *Kuhlmann*, a plurality of the Court enunciated a standard for federal courts to use in deciding whether the "ends of justice" require them to exercise their discretion to excuse an abuse of the writ. The plurality stated that when a prisoner makes a "colorable showing of factual innocence," a federal court should excuse an abuse of the writ. *Id.*[6] The plurality explained that a prisoner, to demonstrate factual innocence, must show that the trier of fact, based on all of the reliable evidence, regardless of its admissibility or availability at trial, *"would have* entertained a reasonable doubt of his guilt." *Id.* at 454 n. 17, 106 S.Ct. at 2627 n. 17 (emphasis added) (quoting Friendly, *Is Innocence Irrelevant? Collateral Attack on Criminal Judgments*, 38 U.Chi.L.Rev. 142, 160 (1970)).[7]

It is thus clear that a prisoner, to show his actual (or factual) innocence of a crime, is not required affirmatively to disprove an element of the crime for which he was convicted. Instead, he must demonstrate,

---

**6.** It is appropriate to rely on *Kuhlmann* in this case. *See ante* at 1184 (relying on *Kuhlmann*); *post* at 1196 (Anderson, J., concurring in part, dissenting in part) ("The most explicit elaboration of what the Supreme Court means by 'actual innocence' is contained in the plurality opinion in *Kuhlmann v. Wilson*."). The *Carrier* Court, in using the term "actual innocence," clearly meant factual, as opposed to legal, innocence. *See Smith*, 477 U.S. at 537, 106 S.Ct. at 2668. Indeed, factual and actual innocence embody the same idea. *See Kuhlmann*, 477 U.S. at

463 n. 2, 106 S.Ct. at 2632 n. 2 (Brennan, J., dissenting) (describing plurality's "factual innocence" standard as "actual innocence"). Thus, it is of no moment that *Kuhlmann* was discussing the "ends of justice"; the standard is the same in this case.

**7.** The plurality defined a "colorable showing" as a "fair probability." *Kuhlmann*, 477 U.S. at 454 n. 17, 106 S.Ct. at 2627 n. 17 (quoting Friendly, *supra* p. 1189, at 160).

to a high degree of probability,[8] that the jury (or, in a bench trial, the court), had it had all the reliable evidence before it, *would have* entertained reasonable doubt about his guilt as to some element of the crime for which he was convicted; that the jury might have entertained reasonable doubt is insufficient. Furthermore, unlike in a mere prejudice inquiry, federal courts, in determining whether the prisoner is actually innocent, must consider all reliable evidence, regardless of its admissibility or availability at trial; a prisoner cannot demonstrate his actual innocence "by showing that he might not, or even would not, have been convicted in the absence of the evidence claimed to have been unconstitutionally obtained." *Id.*[9]

I submit that the only reliable way for a federal habeas court to judge, to a high degree of probability, *see supra* note 8, whether the jury *would have* entertained reasonable doubt is for the court to decide whether the jury, as a matter of law, could have done anything but entertain reasonable doubt. While a federal court is able to determine whether a jury, after considering all of the reliable evidence, could have convicted the prisoner (i.e., the prisoner was eligible for a conviction), the court cannot conclude, with any reliability, whether the jury would have found the defendant inno-

cent or guilty. If a defendant is eligible for conviction, a jury has discretion to convict him or not; federal courts simply are unable to read jurors' minds and divine what they probably would have done in a particular situation.[10] Therefore, a federal habeas court, in determining whether a prisoner is actually innocent of a crime, must decide, based on all of the reliable evidence, regardless of its admissibility, whether, as a matter of law, the petitioner's conviction could stand. If so, then the federal habeas court cannot conclude that the prisoner is actually innocent of the crime for which he was convicted; if not, then the prisoner is actually innocent of the crime.

This general standard applies with equal force to claims of error in sentencing. Once a defendant is eligible for a sentence, the sentencer is generally afforded broad discretion in choosing the appropriate sanction; indeed, as the court explains, the sentencer in capital cases must have broad discretion in choosing between life and death. Thus, when a prisoner alleges that a constitutional error resulted in his death sentence and asks a federal court to excuse his abuse of the writ, he must supplement the claim with a showing that he is ineligible for the sentence he received; that is,

**8.** The Court in *Carrier* stated that the prisoner must show that the constitutional violation *"probably* resulted in the conviction of one who is actually innocent," but did not disclose how probable the prisoner's actual innocence must be. *Carrier,* 477 U.S. at 496, 106 S.Ct. at 2649 (emphasis added). The Court has consistently stated, however, that only in an extraordinary case will the fundamental miscarriage of justice exception apply. *Id.; see also Dugger v. Adams,* 489 U.S. 401, 417 n. 6, 109 S.Ct. 1211, 1217–18 n. 6, 103 L.Ed.2d 435 (1989). Thus, the Court would require a high degree of probability that the prisoner is actually innocent. *See, e.g., post* at 1200 (Anderson, J., concurring in part, dissenting in part) (proposing a "more likely than not" requirement). I do not think it necessary to pick a degree of probability; in my opinion, the high showing required by this test makes it necessary for federal courts to turn to objective factors. It would be impossible for a federal court to make such a determination with any certainty if it relied on subjective factors; this is particularly true with regard to sentences, which are an exercise of discretion. For this reason, I propose that we use an "eligibility"

test, analyzing what could be done, rather than trying to read the sentencer's mind (the jury's or the court's) and predict what it would have done. *See infra* p. 1190.

**9.** In other words, federal habeas courts will not vindicate prophylactic rules, like the exclusionary rule, at this stage of the petitioner's quest for habeas relief; these rules have little to do with finding actual innocence.

**10.** *It is for this reason that I cannot accept* Judge Anderson's proposed standard for judging actual innocence. In my view, that standard, which requires federal courts to determine whether it is more likely than not that the jury would have judged the petitioner differently absent the constitutional error, will promote uncertainty and arbitrariness in federal habeas corpus. Federal judges, asked to read jurors' or judges' minds and divine their intentions, will undoubtedly come to irreconcilable conclusions in factually similar cases. I would, thus, limit a federal habeas court's inquiry to objective factors. *See supra* note 8.

the prisoner must show, in addition to a constitutional violation, that, in light of all the reliable evidence, his death sentence cannot stand as a matter of law. It is not enough for a prisoner to claim that some error may have affected the sentencer's deliberations or that the sentencer likely would have decided the issue differently had it been exposed to all of the reliable evidence; neither a habeas corpus petitioner nor a federal habeas court is able to make such a determination with any reliability, as required by the Supreme Court.

The standard I suggest for determining actual innocence is, as I state, essentially an "eligibility" test. I differ from the court, however, in that I view eligibility as more than simply a question of federal law. The court, in defining eligibility for the death penalty, only focuses on requirements the United States Constitution imposes on the states in fashioning death penalty schemes; it ignores state-law limits on death sentences. In my view, a federal court, in judging whether a fundamental miscarriage of justice will occur by its refusal to entertain an abusive claim on habeas corpus, must look to eligibility as defined both by federal and state law. Thus, a prisoner may demonstrate his actual innocence by bringing forth reliable facts, which, due to an alleged constitutional violation, were not considered at trial or at a sentencing hearing, that show he is, under the United States Constitution, ineligible for the conviction or sentence he received. Or, the prisoner may introduce reliable facts, previously undisclosed because of constitutional error, that demonstrate, as a matter of state law, his ineligibility for the conviction or sentence he received; for example, where the trial court, after examining this newly produced evidence, would be obligated to set aside a jury's sentencing decision.[11] A prisoner, however, cannot satisfy this test by showing that absent the illegally obtained, but reliable, evidence, which the state placed in the record, he could not have been found guilty or sentenced to death; nor is this test satisfied by

the introduction of new evidence that merely buttresses the prisoner's position.

Judge Anderson, in dissent, argues that an eligibility test is inconsistent with Supreme Court precedent, specifically *Smith*, 477 U.S. at 527, 106 S.Ct. at 2661, and *Dugger v. Adams*, 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989). The Court has not adopted one clear test to use in deciding whether a petitioner is actually innocent. Careful analysis, however, reveals that the Court, in determining whether the petitioners in these cases were actually innocent, relied on the standard I set forth—whether, examining all reliable evidence, the prisoner, as a matter of federal or state law, was eligible for the conviction or sentence he received.

Generally, claims on habeas corpus fall into two broad categories: (1) those that allege constitutional error that infected the deliberative process as a whole and (2) those that allege constitutional error that affected the determination of a particular material fact. In *Adams*, 489 U.S. at 401, 109 S.Ct. at 1211, the petitioner presented a procedurally barred "category-one" claim; the petitioner alleged that the trial judge had misinformed the jury as to its responsibility concerning the death sentence, in violation of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). The "essence of a *Caldwell* claim is that the accuracy of the sentencing determination has been unconstitutionally undermined." *Adams*, 489 U.S. at 423, 109 S.Ct. at 1224 (Blackmun, J., dissenting). Such a claim, however, even if accepted, does not necessarily undermine the accuracy the jury's material findings; rather, this claim rests on the possibility that the jury, had the trial judge properly instructed it as to its role in the sentencing process, would have sentenced the defendant differently. *See Caldwell*, 472 U.S. at 340, 105 S.Ct. at 2645 ("Such comments, if left uncorrected, might so affect the fundamental fairness of the sentencing proceeding as to violate the Eighth Amendment."). In rejecting the

---

11. The eligibility test I set forth incorporates proportionality review, where state courts examine objectively whether the sentence received in a particular case is proportionate to the sentences received in factually similar cases.

petitioner's claim of actual innocence, the Court held that "[d]emonstrating that an error is by its nature the kind of error that might have affected the accuracy of a death sentence is far from demonstrating that an individual defendant probably is 'actually innocent' of the sentence he or she received." *Adams,* 489 U.S. at 417 n. 6, 109 S.Ct. at 1217–18 n. 6.

In *Smith,* 477 U.S. at 527, 106 S.Ct. at 2661, the petitioner brought a procedurally barred "category-two" claim; the petitioner alleged that the trial court erroneously allowed a psychiatrist, appointed to assist the petitioner's defense, to testify in the sentencing phase of his murder trial about incriminating statements the petitioner made during his psychiatric interview, in violation of his fifth amendment right against self-incrimination. The psychiatrist's testimony, which divulged "prior incidents of deviant sexual conduct" by the petitioner, *id.* at 530, 106 S.Ct. at 2664, established that the petitioner constituted a continuing threat to society, one of two statutory aggravating circumstances under Virginia's death penalty scheme. The petitioner claimed that the jury would not have found, absent the unconstitutional admission of the incriminating statements, this aggravating circumstance and that, absent this aggravating circumstance, he would not have received a death sentence. The Court, after concluding that there was no

cause to excuse the procedural default,[12] analyzed whether the petitioner was actually innocent of the death sentence he had received.

The jury, in sentencing the petitioner to death, had found that both statutory aggravating circumstances provided for under state law—(1) continuing threat to society and (2) outrageously or wantonly vile conduct in committing the offense—existed. The Virginia Supreme Court, assuming the existence of both statutory aggravating circumstances, affirmed the petitioner's death sentence on direct review; it did not consider whether the jury had properly found these circumstances to exist and did not indicate that it would have affirmed the petitioner's death sentence in the absence of one of these statutory aggravating circumstances. *See Smith v. Commonwealth,* 219 Va. 455, 248 S.E.2d 135 (1978). Thus, the United States Supreme Court assumed that the challenged testimony by the psychiatrist, which established one of the statutory aggravating circumstances, "made the difference between life and death in the jury's consideration of his fate," *Smith,* 477 U.S. at 539, 106 S.Ct. at 2669 (Stevens, J., dissenting);[13] in other words, the Court assumed that state law required, for that case, both statutory aggravating circumstances to support the death sentence.[14] Thus, in determining

---

**12.** The petitioner's attorney failed to raise this claim on direct appeal. Under Virginia procedural law, the petitioner was thus barred from subsequently raising the claim in a collateral attack on his conviction. The Supreme Court rejected the petitioner's argument that his appellate counsel's ignorance, the perceived futility of raising the claim at the time of his appeal, or the alleged novelty of the claim was cause to excuse the procedural default. *See Smith,* 477 U.S. at 533–37, 106 S.Ct. at 2665–68.

**13.** The Court also assumed that a constitutional violation had occurred; in other words, the jury should not have heard the evidence that established the first of the statutory aggravating circumstances.

**14.** Under the Virginia death penalty scheme in place at the time the petitioner in *Smith* was sentenced, only one of the two statutory aggravating circumstances was necessary to support a death sentence. *Smith,* 248 S.E.2d at 145. The establishment of one statutory aggravating cir-

cumstance, however, did not mean, under Virginia law, that a defendant would receive a death sentence. The jury was at liberty to recommend a sentence of life imprisonment, even if the state established one or both of the statutory aggravating circumstances. *Id.* Following the jury's recommendation, state law required the trial judge to determine whether the death penalty was "appropriate and just"; if not, the judge was entitled to set aside the jury's recommendation of death and impose a life sentence. *Id.* at 146. Moreover, on mandatory review of a death sentence, the Virginia Supreme Court was required to determine: (1) whether the sentence was imposed under the influence of passion, prejudice, or other arbitrary factors and (2) whether, considering similar cases, the penalty was excessive or disproportionate. *Id.* Without any indication to the contrary, the Supreme Court properly assumed that, under applicable state law, both statutory aggravating factors were necessary to uphold the petitioner's death sentence.

whether the petitioner was actually innocent of the death sentence he had received, the Court examined whether the alleged constitutional error had undermined the accuracy of the jury's finding of a necessary statutory aggravating circumstance; the Court inquired, in light of all reliable evidence, "whether *in fact* petitioner constituted a continuing threat to society." *Id.* at 538, 106 S.Ct. at 2668.[15]

The Court, in conducting this inquiry, noted that the petitioner did not allege that the psychiatrist's testimony was "false or misleading in any way"—though he contended that it had been erroneously presented to the jury. *Id.* Nor did the alleged constitutional violation preclude the admission of other reliable facts that would have demonstrated the inaccuracy of the jury's factual finding that the petitioner constituted a continuing threat to society. Therefore, the petitioner did not prove he was actually innocent of the death sentence; he failed to demonstrate that his death sentence could not stand as a matter of law.

These cases thus support the eligibility test I set forth. *Smith* makes clear that a petitioner can demonstrate his actual innocence only if he shows that, under either federal or state law, his conviction or sentence cannot stand; it is not enough to suggest that the outcome would have been different absent the constitutional violation, *see supra* note 8. To satisfy this burden, a petitioner usually must bring a "category-two" claim, alleging that a constitutional error either "precluded the de-

---

**15.** Judge Anderson argues, in dissent, that *Smith* is inconsistent with the court's eligibility test because the *Smith* Court could "have noted the existence of the untainted aggravating circumstance, concluded that the defendant was still eligible for the death penalty, and thus found that the miscarriage of justice standard was not satisfied," *post* at 1199 (Anderson, J., concurring in part, dissenting in part); indeed, the Fourth Circuit, in upholding the petitioner's death sentence, had relied on the existence of one untainted statutory aggravating circumstance. I agree with Judge Anderson that *Smith,* as well as *Adams,* undermines the court's eligibility test, which focuses solely on whether the petitioner would be eligible under federal law for the death penalty. Under the standard I set forth, however, the mere existence of one untainted statutory aggravating circumstance does not necessarily mean that a defendant is eligible for the death penalty. *See, e.g., supra* note 14.

Indeed, close analysis of the Fourth Circuit's opinion in *Smith* demonstrates that the court improperly disposed of that case, even assuming there was no state procedural default. The Fourth Circuit, on habeas corpus review, held that the admission of the psychiatrist's testimony, even if erroneous, could not be the basis for invalidating the petitioner's sentence because the alleged error only undermined the jury's finding as to one statutory aggravating circumstance. The court, relying on *Zant v. Stephens,* 462 U.S. 862, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983), reasoned that since only one statutory aggravating circumstance was necessary to support the constitutionality of a death sentence, the petitioner's death sentence could stand despite the loss, on collateral review, of one of the statutory aggravating circumstances the jury relied on in sentencing him. The Supreme Court granted certiorari to decide whether the Fourth Circuit had applied *Stephens* properly. The Court never reached that question, however, because it found the claim procedurally barred.

The Fourth Circuit arguably committed several errors in its application of *Stephens.* For our purposes, its most significant error was that it did not ask the Virginia Supreme Court whether state law would permit the petitioner's death sentence to stand after one of the statutory aggravating circumstances was reversed on collateral review. As explained *supra* note 14, under Virginia law, a death sentence may be improper, in certain cases, even if the state proves one or both statutory aggravating circumstances; a federal court, then, must discover whether state law would permit the sentence to stand when material changes occur in the defendant's sentencing portfolio. The Fourth Circuit simply failed to provide any state-law premise for upholding the petitioner's death sentence.

In contrast, the Supreme Court in *Stephens* initially asked the Georgia Supreme Court to explain the state-law premise for its decision allowing a death sentence to stand after invalidating an aggravating circumstance; only after learning the state-law premise for the court's decision did the Supreme Court address the merits of the federal claims. *See id.* at 870–73, 890, 103 S.Ct. at 2739–41, 2749 ("We accept [the Georgia Supreme Court's] view that the subsequent invalidation of one of several statutory aggravating circumstances does not automatically require reversal of the death penalty. . . ."). For another explanation of why the Fourth Circuit erred in its application of *Stephens,* see *Smith,* 477 U.S. at 554–55, 106 S.Ct. at 2676–77 (Stevens, J., dissenting). Thus, in my opinion, the Supreme Court properly assumed, contrary to the Fourth Circuit's position, that both statutory aggravating circumstances were necessary, under state law, to uphold the death sentence in *Smith.*

velopment of true facts [ ]or resulted in the admission of false ones," *id.* at 538, 106 S.Ct. at 2668, with respect to a material issue; then he must demonstrate, in light of all the reliable evidence, that the jury's or trial court's finding as to the ultimate material fact was inaccurate. By doing this, the petitioner would demonstrate that, as a matter of law, his conviction or sentence could not be sustained because a necessary element could not be established. It is, however, as *Adams* explains, unlikely that a petitioner will be able to demonstrate his actual innocence if he brings only a "category-one" claim, alleging that a constitutional violation corrupted the deliberative process as a whole. Such a claim does not demonstrate his ineligibility for the conviction or sentence he received because the claim does not necessarily undermine the accuracy of any finding that is required, under federal or state law, to sustain his conviction or sentence. Such claims are premised on the notion that, absent the alleged error, the judge or jury might have viewed things differently.[16] While this may be true, and may suffice to demonstrate prejudice, it is insufficient to demonstrate actual innocence.

2.

Applying the standard I set forth, it is clear that a fundamental miscarriage of justice will occur if we refuse to entertain the petitioner's abusive claim. As the petition before us alleges, the sentencing judge, because of the ineffectiveness of petitioner's counsel, was not presented with evidence that would have established the existence of three statutory mitigating circumstances. As I explain below, under Florida's death penalty scheme, the judge, if presented with this additional evidence, would not have been able to override the jury's life recommendation and sentence the petitioner to death; in other words, taking into account all the reliable evidence

defense counsel should have presented at sentencing, the judge, as a matter of law, could not have sentenced the petitioner to death.

Under Florida law, the jury, based on the evidence presented to it during the sentencing phase of a trial, renders an advisory sentence to the court, recommending life imprisonment or death. Fla.Stat. § 921.141(2) (Supp.1990). This recommendation is based on the jury's evaluation of the statutory aggravating circumstances and the mitigating circumstances presented by the state and the defendant. *Id.* The court then reviews the jury's recommendation, reweighing the aggravating and mitigating circumstances, *id.* § 921.141(3); in so doing, the sentencing judge may consider evidence not presented to the jury, *see, e.g., Cochran v. State,* 547 So.2d 928, 931 (Fla.1989) ("Under our law, it was proper for the trial court to take into consideration appellant's previous conviction ..., even though that conviction was not presented to the jury."). The jury's recommendation, however, is entitled to great weight; indeed, if the jury recommends life imprisonment, its recommendation is presumed correct and the court can only overcome this presumption and impose a death sentence if "the facts suggesting a sentence of death [are] so clear and convincing that virtually no reasonable person could differ." *Tedder v. State,* 322 So.2d 908, 910 (Fla.1975). The Florida Supreme Court has strictly enforced the *Tedder* standard, *see Mann v. Dugger,* 844 F.2d 1446, 1451 (11th Cir.1988) (en banc) ("That the court meant what it said in *Tedder* is amply demonstrated by the dozens of cases in which it has applied the *Tedder* standard to reverse a trial judge's attempt to override a jury recommendation of life."); the court has explained that the sentencing judge may not override the jury's life recommendation if there is any reasonable basis in fact to support it, *Barfield v. State,* 402 So.2d 377,

---

**16.** Of course, most petitioners, in bringing a "category-one" claim, will argue that, absent the alleged constitutional violation, the jury would

have viewed things differently. Such an argument, however, cannot be made with any relia-

382 (Fla.1981).[17]

In the present case, the jury recommended life imprisonment for the petitioner. One month later, the trial judge held a hearing to consider any evidence the parties wished to present and to hear their arguments as to the sentence that the court should impose. Defense counsel presented no additional evidence—for example, evidence that would have established the three statutory mitigating circumstances the petitioner alleges were available. Rather, he simply urged the court to accept the jury's recommendation. Counsel's "strategy" failed; the trial judge overrode the jury's recommendation of life imprisonment, finding "no mitigating circumstances ... to weigh against the aggravating circumstances," and sentenced the petitioner to death. I think it is clear that had the evidence the petitioner now proffers been introduced, the judge would have had to accept, as a matter of state law, the jury's recommendation of life imprisonment. The judge, faced with a record establishing at least three statutory mitigating circumstances, would have been unable to conclude that the jury's recommendation of life imprisonment was unreasonable.[18] Furthermore, had the trial judge overridden the jury's recommendation, the Florida Supreme Court, in accordance with its precedent, would have vacat-

ed the judge's override and reimposed the jury's life recommendation. The record, supplemented with the reliable evidence of mitigating circumstances proffered by the petitioner, simply does not demonstrate that death is the only reasonable sentence and, thus, as a matter of Florida law, a trial judge could not override a jury's life recommendation.[19]

## II.

Because, absent the alleged constitutional violation, the trial judge, as a matter of law, could not properly have sentenced the petitioner to death, I conclude that our refusal to entertain the petitioner's abusive ineffective assistance of counsel claim will result in a fundamental miscarriage of justice. Coincidentally, this conclusion applies with equal force to the petitioner's request that we excuse his state procedural default, *see supra* note 3; therefore, it is unnecessary for us to examine whether he can demonstrate cause to excuse his state procedural default. Accordingly, I would excuse both the abuse of the writ and the state procedural default in this case and remand the case to the district court for an evidentiary hearing on petitioner's ineffective assistance of counsel claim. Because the court holds otherwise, I respectfully dissent.

bility; it depends solely on the petitioner's clairvoyance.

17. Similarly, a jury's recommendation of death is entitled to great deference by the trial judge. *Mann,* 844 F.2d at 1451–53.

18. As I note above, the sentencing judge, when deciding whether to accept the jury's recommendation, is allowed to consider evidence that was not presented to the jury. Thus, the judge in the petitioner's case would have presumed the correctness of the jury's life recommendation and, in deciding whether it was reasonable in light of the facts of the case, would have examined all the facts presented to the jury and, later, to him at the sentencing hearing.

19. As Judge Anderson convincingly notes, the history of this case demonstrates that the Florida Supreme Court clearly would have reversed the judge's override if the three statutory mitigating circumstances had been established. The

Florida Supreme Court, by a four-to-three vote, affirmed the judge's override based on a record of four statutory aggravating circumstances and no mitigating circumstances, statutory or otherwise, *Johnson,* 393 So.2d at 1074; the three dissenting justices were unconvinced on that record that the jury's recommendation of life imprisonment was unreasonable. More recently, two Florida Supreme Court justices, who were not on the court when it decided the petitioner's direct appeal, noted their dissatisfaction with the trial judge's override. *Johnson v. Dugger,* 523 So.2d 161, 163 (Fla.1988) (Barkett, J., specially concurring; Kogan, J., joining Justice Barkett's concurrence) (agreeing that court is bound by law of case). This history indicates that the Florida Supreme Court was reluctant to affirm the jury override *even in the absence of any mitigating circumstances.* It is clear to me, then, that the court would not have affirmed the jury override had the petitioner's counsel introduced the evidence now proffered to establish three statutory mitigating circumstances.

ANDERSON, Circuit Judge, concurring in part, dissenting in part, in which KRAVITCH, JOHNSON and CLARK, Circuit Judges, join:

I concur in the court's resolution of all of the claims presented by Johnson, with one exception. With respect to Johnson's claim of ineffective assistance of counsel at sentencing, I dissent. Respectfully, I submit that the eligibility theory adopted today by the court is inconsistent with the guidance which the Supreme Court has given us on the meaning of the concept "actually innocent of the death penalty."

## A. Supreme Court Precedent

In *Smith v. Murray*, 477 U.S. 527, 106 S.Ct. 2661, 91 L.Ed.2d 434 (1986), the Supreme Court acknowledged that the concept of actual innocence does not translate easily into the context of an alleged error at the sentencing phase. In concluding that the claim of error there did not result in a fundamental miscarriage of justice, the Supreme Court made three comments which provide guidance with respect to the meaning of the concept. First, the Court said of the alleged error in *Smith* that it "neither precluded the development of true facts nor resulted in the admission of false ones." 477 U.S. at 538, 106 S.Ct. at 2668. Second, the Court assumed that as a legal matter the testimony about the prior school bus incident should not have been presented to the jury. Having assumed error in the admission of evidence, the Court nevertheless said that "its admission did not serve to pervert the jury's deliberations concerning the ultimate question whether in fact petitioner constituted a continuing threat to society." *Id.* at 538, 106 S.Ct. at 2668. Finally, the Supreme Court said: "We similarly reject the suggestion that there is anything 'fundamentally unfair' about enforcing procedural default rules in cases devoid of any substantial claim that the alleged error undermined the accuracy of the guilt or sentencing determination." *Id.* at 538–39, 106 S.Ct. at 2668. In other words, in *Smith* the Supreme Court fo-

cused on the accuracy of the sentencing determination.

In *Dugger v. Adams*, 489 U.S. 401, 109 S.Ct. 1211, 103 L.Ed.2d 435 (1989), the dissent read *Smith v. Murray* as establishing the following test: "A substantial claim that the constitutional violation undermined the accuracy of the sentencing decision." 489 U.S. at 415 n. 4, 109 S.Ct. at 1219 n. 4. The dissent went on to argue that the *Caldwell*[1] claim at issue there was precisely the *kind* of claim that satisfies the test. The majority did not reject the test suggested by the dissent, but rather rejected the dissent's application of the test as overbroad.

> The dissent "assumes arguendo" that a fundamental miscarriage of justice results whenever "there is a substantial claim that the constitutional violation undermined the accuracy of the sentencing decision." *Post*, at 1219, n. 4. According to the dissent, since "the very essence of a *Caldwell* claim is that the accuracy of the sentencing determination has been unconstitutionally undermined," *Post*, at 1223, the standard for showing a fundamental miscarriage of justice necessarily is satisfied. We reject this overbroad view. Demonstrating that an error is by its nature the kind of error that might have affected the accuracy of a death sentence is far from demonstrating that an individual defendant probably is "actually innocent" of the sentence he or she received.

489 U.S. at 417 n. 6, 109 S.Ct. at 1217–18 n. 6. In other words, the Supreme Court rejected the notion that the test is satisfied simply because the generic nature of a claim is such that "by its nature" it "might" affect the accuracy of the sentencing decision. The test is not that; rather, the test is whether the error *did in fact* undermine accuracy—i.e., whether the individual defendant can demonstrate that he is actually innocent of the sentence.

The most explicit elaboration of what the Supreme Court means by "actual innocence" is contained in the plurality opinion in *Kuhlmann v. Wilson*, 477 U.S. 436, 106

---

1. *Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985).

S.Ct. 2616, 91 L.Ed.2d 364 (1986). In the related context of a successive petition for federal habeas corpus, the plurality held that the analogous "ends of justice" test requires a federal court to entertain a successive habeas petition only where the petitioner makes a "colorable showing of factual innocence." 477 U.S. at 454, 106 S.Ct. at 2627. The plurality borrowed the standard from Judge Friendly's famous article[2] in order to effectuate "the clear intent of Congress that successive federal habeas review should be granted only in rare cases, but that it should be available when the ends of justice so require." *Id.* The Supreme Court elaborated upon the meaning of the standard as follows:

> As Judge Friendly explained, a prisoner does not make a colorable showing of innocence "by showing that he might not, or even would not, have been convicted in the absence of evidence claimed to have been unconstitutionally obtained." Friendly, *supra*, at 160. Rather, the prisoner must "show a fair probability that, in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it), and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial, the trier of facts would have entertained a reasonable doubt of his guilt." *Ibid.* (footnote omitted). Thus, the question whether a prisoner can make the requisite showing must be determined by reference to *all* probative evidence of guilt or innocence.

*Id.* at 454 n. 17, 106 S.Ct. at 2627 n. 17 (emphasis in original).

I submit that the Supreme Court has clearly indicated what it means by the term "actually innocent." The focus is on the accuracy of the sentencing determination. In the guilt phase, *Kuhlmann* states the test as whether "the trier of facts would have entertained a reasonable doubt of his guilt" based on the true facts. In the sentencing context, I submit that the Supreme Court contemplates a test which fo-

cuses on whether the trier of facts would have imposed a life sentence if the true facts had been presented.

The eligibility theory adopted today by this court is inconsistent with the foregoing Supreme Court precedent. First, everything the Supreme Court has said indicates that the proper analysis revolves around the accuracy of the sentencing determination. In *Smith v. Murray*, the Supreme Court inquired whether the alleged error "precluded the development of the true facts or resulted in the admission of false facts," whether the jury's deliberations were "perverted," and whether there was a "substantial claim that the alleged error undermined the accuracy of the guilt or sentencing determination." In *Dugger v. Adams*, the Supreme Court clarified that it was not the generic nature of the alleged error; there had to be more than a mere claim that the alleged error "by its nature" "might" affect accuracy; rather, there must be a showing that the alleged error *did in fact* cause an inaccurate result. And in *Kuhlmann*, the Supreme Court made it clear that the analysis focuses on what the trier of facts would have done on the basis of the true facts. The eligibility theory adopted by the court today ignores Supreme Court precedent. The eligibility theory does not focus on the overall accuracy of the sentencing determination. The only thing relevant to the eligibility theory is whether there is at least one aggravating circumstance to make the defendant eligible for the death penalty.

Second, the eligibility theory is inconsistent with the above quotation from *Kuhlmann*, which indicates that the proper analysis considers *all probative evidence.* The eligibility theory does not consider all of the probative circumstances; rather, it looks only to whether there was at least one untainted aggravating circumstance so that the defendant was eligible for the death penalty.

**2.** Friendly, *Is Innocence Irrelevant, Collateral Attack on Criminal Judgments,* 38 U.Chi.L.Rev. 142, 146–48 (1970).

Third, I submit that the majority's eligibility theory is inconsistent with *Murray v. Carrier*, 477 U.S. 478, 106 S.Ct. 2639, 91 L.Ed.2d 397 (1986). Referring to the miscarriage of justice concept, the Court said:

> However, as we noted in *Engle*, "in appropriate cases" the principles of comity and finality that inform the concepts of cause and prejudice "must yield to the imperative of correcting a fundamentally unjust incarceration." 456 U.S. at 135, 102 S.Ct. at 1576. We remain confident that, for the most part, "victims of a fundamental miscarriage of justice will meet the cause-and-prejudice standard." *Ibid.* But we do not pretend that this will always be true. Accordingly, we think that in an extraordinary case, where a constitutional violation has probably resulted in the conviction of one who is actually innocent, a federal habeas court may grant the writ even in the absence of a showing of cause for the procedural default.

477 U.S. at 495–96, 106 S.Ct. at 2649. The Supreme Court is talking about a last resort standard which is tied to the imperative of correcting a fundamental miscarriage of justice. To fulfill that role, common sense suggests, and indeed *Kuhlmann* expressly holds, that the appropriate standard would have to take into consideration all probative circumstances and would have to focus on what the result would have been based on the true facts. In contrast, the eligibility test ignores the to-

tality of the circumstances and ignores the basic concept of a fundamental miscarriage of justice; instead, it focuses in a rigid and mechanical manner upon a single circumstance, i.e., whether or not at least one aggravating circumstance is present.[3]

It is instructive to translate the eligibility theory from the sentencing phase to the guilt phase. The majority's analysis of the historical evolution of death penalty jurisprudence since *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), leads it to conclude that the death penalty today is really the equivalent of the new substantive offense of "aggravated murder." However, even assuming the appropriateness of such an analogy, the state of Florida has defined the "substantive offense" as including the elements of murder plus two other elements—the existence of a statutory aggravating factor and the lack of sufficient mitigating circumstances to outweigh the aggravating factors. *See* Fla.Stat.Ann. § 921.141(2) (West 1985). The majority's analysis looks only to the first element. Although it is true that the second element is dependent on discretion, this is certainly also true of other substantive offenses as well. For example, the difference between voluntary manslaughter and murder often turns on the fact-finder's discretion with respect to whether sufficient provocation exists. The court today wholly ignores the second element and thus produces a fundamentally flawed analysis.[4]

---

**3.** A panel of this court recently summed up the foregoing Supreme Court precedent as follows:

> While the Supreme Court has not provided extensive guidelines to guide the application of the actual innocence exception, a few things are clear. The Court has held that the actual innocence exception applies to those who were wrongly sentenced to death. *See Smith v. Murray, supra.* The exception should be used only in extraordinary cases. *See Murray v. Carrier, supra.* And in addition the exception should be used only when three factors are present: first, the error precluded the development of true facts or resulted in the admission of false facts, *see Smith v. Murray, supra;* second, the error casts significant doubts upon the accuracy of the conviction or sentence, *see Murray v. Carrier, supra;* and third, the error is specifically tied to the individual case and does not merely raise the

possibility that the sentence was inaccurate. *See Dugger v. Adams, supra.*

*Aldridge v. Dugger*, 925 F.2d 1320, 1328 (11th Cir.1991).

**4.** Furthermore, the majority's analysis is likely to produce anomalous results that could not have been intended by the Supreme Court. For example, under the majority's eligibility theory, a criminal defendant made death-eligible by a conviction for felony-murder during the guilt phase of trial, *see* Fla.Stat.Ann. § 921.141(5)(d), would be forever unable to obtain relief from a procedural default regardless of the extent, nature, or gravity of an error at the sentencing phase. The majority's test would force this result even if every prosecution witness at the sentencing phase lied on the stand or every statutory mitigating factor listed in Fla.Stat.Ann. § 921.141(6) was supported by actual fact but had not been presented by incompetent counsel. Indeed, even a circumstance as egregious as a

Finally, the eligibility test is inconsistent with Supreme Court precedent as revealed by a close reading of *Smith v. Murray, supra,* and *Dugger v. Adams, supra.* In both of those cases, there were other aggravating circumstances which could not have been tainted by the alleged constitutional error. Had the Supreme Court intended to adopt an eligibility test, it would merely have noted the existence of the untainted aggravating circumstance, concluded that the defendant was still eligible for the death penalty, and thus found that the miscarriage of justice standard was not satisfied. In fact, in *Smith v. Murray,* the Fourth Circuit had expressly relied on the fact that there were two aggravating circumstances and the alleged error related to only one of the two aggravating factors. The Supreme Court expressly noted this fact and the Fourth Circuit's reliance on it. 477 U.S. at 532, 106 S.Ct. at 2665. Thus, the fact that is crucial to the eligibility test was apparent to the Supreme Court, but the Supreme Court analysis focused not on eligibility, but rather on the accuracy of the sentencing determination.

## B. *Precedent Other Than Supreme Court*

Over 100 cases have considered the miscarriage of justice exception since *Smith v. Murray, supra,* was handed down. No court has adopted the eligibility theory articulated by this court today. Most of the cases have merely concluded in a rather summary manner that the miscarriage of justice standard was not satisfied. However, the Eighth Circuit has very clearly adopted substantially the same standard that I propose. The Eighth Circuit articulates the standard this way:

> In the penalty-phase context this exception will be available if the federal constitutional error alleged probably resulted in a verdict of death against one whom the jury would otherwise have sentenced to life imprisonment.

*Stokes v. Armontrout,* 893 F.2d 152, 156 (8th Cir.1989); *Smith v. Armontrout,* 888

F.2d 530, 545 (8th Cir.1989). *See also Henderson v. Sargent,* 926 F.2d 706 (8th Cir.1991).

## C. *The Appropriate Standard*

Certain themes can be culled from the Supreme Court and other precedent discussed above. First, we know that a constitutional claim that challenges only the admissibility of certain evidence without also contesting the reliability of that evidence provides insufficient grounds to excuse a procedural default. *Smith v. Murray,* 477 U.S. at 538, 106 S.Ct. at 2668. Second, we know that the appropriate standard focuses upon the accuracy of the sentencing determination. *Smith v. Murray,* 477 U.S. at 38–39, 106 S.Ct. at 2668. ("The alleged constitutional error neither precluded the development of true facts nor resulted in the admission of false ones"; "its admission did not serve to pervert the jury's deliberations"; "substantial claim that the alleged error undermined the accuracy of the guilty or sentencing determination"). Third, we know that the appropriate standard does not focus on the generic nature of a claim that "by its nature" "might" affect the accuracy of the sentencing decision; rather, the test is whether the error did in fact undermine accuracy. *Dugger v. Adams,* 489 U.S. at 417 n. 6, 109 S.Ct. at 1218 n. 6. Fourth, we know that the appropriate standard focuses upon what the trier of fact would have done on the basis of the true facts. *Kuhlmann v. Wilson,* 477 U.S. at 454 n. 17, 106 S.Ct. at 2627 n. 17 ("the trier of facts would have entertained a reasonable doubt of his guilt" based upon "all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial"). Finally, we know that the standard must be one reserved for the extraordinary case.

Drawing upon the foregoing Supreme Court precedent, I submit that the appro-

---

jury which had been bribed could not circumvent the unimpeachable statutory aggravating factor that the murder was committed in the

course of a felony listed in § 921.141(5)(d). Nevertheless, such results would be dictated by the majority's eligibility test.

priate standard should be as follows: The miscarriage of justice concept permits consideration of a defaulted claim, even in the absence of a showing of "cause," where the alleged constitutional error has resulted in a factually inaccurate sentencing profile, *and* the inaccuracies are so significant that the result would have been different.

The court, in adopting the eligibility test today, is apparently motivated by a desire to implement the Supreme Court mandate that the miscarriage of justice concept be reserved for the extraordinary case. *Murray v. Carrier,* 477 U.S. at 496, 106 S.Ct. at 2649. Respectfully, I submit that it is feasible to honor this mandate, without ignoring, as the court does today, the Supreme Court's mandate that the appropriate standard focus upon the accuracy of the sentencing determination. I submit that the standard I propose will be reserved for the rare case. Over 100 cases have considered the miscarriage of justice concept since *Smith v. Murray, supra,* was handed down. Almost no case has found that the standard was satisfied.[5]

Although most of the cases discuss the standard in summary fashion, because the standard I propose reflects the common sense meaning of the language used by the

several applicable Supreme Court decisions, I submit that the cases have applied a similar standard. The Eighth Circuit has expressly done so. *See Stokes; Smith, supra.* No case has given the slightest indication of adopting the novel eligibility test adopted by the majority. Thus, the fact that over 100 cases have applied the standard, and so few have held that the standard was met, including no case in the capital sentencing context, provides strong evidence that the standard does implement the Supreme Court mandate that it be reserved for the extraordinary case.

To further ensure that the standard is reserved for the rare case, I propose an outcome determinative standard under which the reviewing court must conclude that the factual inaccuracies were so significant that it is *more likely than not* that the result would have been different.[6] This is the higher standard which the Supreme Court in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), rejected in favor of the lower "reasonable probability" standard to govern analysis of the prejudice prong of ineffective assistance of counsel. The Supreme Court described this higher standard as follows:

---

5. One district court opinion found the standard satisfied in a case not involving the death penalty. *See Pilchak v. Camper,* 741 F.Supp. 782, 796–97 (W.D.Mo.1990). *See also Jones v. Arkansas,* 929 F.2d 375, 380–81 (8th Cir.1991) (relief granted; non-capital case). In addition, the Eighth Circuit suggested that the standard was satisfied in two cases, neither of which involved a sentencing determination. *See Henderson v. Sargent,* 926 F.2d 706 (8th Cir.1991); *Bliss v. Lockhart,* 891 F.2d 1335, 1342 (8th Cir.1989). *See also Rode v. Lockhart,* 675 F.Supp. 491 (E.D. Ark.1987). In *United States ex rel. Williams v. Lane,* 645 F.Supp. 740, 748 (N.D.Ill.1986), a noncapital case, the court found that a fundamental miscarriage of justice had resulted from the prosecutor's improper commentary on the petitioner's failure to testify. However, the Seventh Circuit reversed that determination, finding that the "prosecutor's allegedly improper remarks 'neither precluded the development of true facts nor resulted in the admission of false ones'" and that such remarks did not sufficiently pervert the jury's deliberations. *Williams v. Lane,* 826 F.2d 654, 664 (7th Cir.1987) (quoting *Smith v. Murray,* 106 S.Ct. at 2668).

6. The several applicable Supreme Court cases have referred to the standard in terms of whether the petitioner is "probably" actually innocent of the death sentence. *Dugger v. Adams,* 489 U.S. at 417 n. 6, 109 S.Ct. at 1217–18 n. 6 ("probably is 'actually innocent' of the sentence"); *Smith v. Murray,* 477 U.S. at 537, 106 S.Ct. at 2667 ("probably resulted in the conviction of one who is actually innocent," quoting from *Murray v. Carrier,* 477 U.S. at 496, 106 S.Ct. at 2469); *Kuhlmann v. Wilson,* 477 U.S. at 454 n. 17, 106 S.Ct. at 2627 n. 17 ("fair probability that ... the trier of the facts would have entertained a reasonable doubt of his guilt," quoting from Judge Friendly's article). I recognize that the term "probably" could have two meanings: the lower "reasonable probability" standard or the higher "more likely than not" standard. I propose adoption of the higher standard in order to ensure that the miscarriage of justice concept be reserved for the extraordinary case. Moreover, the higher standard also creates another sharp difference between this standard and that governing the prejudice prong of the "cause and prejudice" standard, which is identical to the prejudice necessary to show ineffective assistance of counsel.

On the other hand, we believe that a defendant need not show that counsel's deficient conduct more likely than not altered the outcome in the case. This outcome-determinative standard has several strengths. It defines the relevant inquiry in a way familiar to courts, though the inquiry, as is inevitable, is anything but precise. The standard also reflects the profound importance of finality in criminal proceedings. Moreover, it comports with the widely used standard for assessing motions for new trial based on newly discovered evidence.

*Id.* at 693–94, 104 S.Ct. at 2068. The higher, more likely than not, standard was not appropriate for the prejudice prong of ineffective assistance of counsel, but it is appropriate for the actual innocence exception. Here the "profound importance of finality in criminal proceedings" must be reflected.[7]

### D. *Application of the Standard to the Instant Case*

The alleged constitutional error at issue in this case is ineffective assistance of counsel at sentencing. As indicated in the opinion for the court, the record indicates that the attorneys who conducted the sentencing phase were not present during the guilt phase. Petition at 78; Appendix 4 (Affidavit of Terry Terrell). The guilty verdict was returned on December 8, 1978. The penalty phase was to begin at 9 a.m. on December 9, 1978. The record indicates that counsel did not begin to look for a psychiatrist or psychologist to testify at the penalty phase until after the guilty verdict, i.e., until the day before sentencing. However, counsel did locate Dr. Yarbrough and were able to take Dr. Yarbrough to the jail at approximately 11 p.m. the night before sentencing. Record at 1619. However, counsel did not inform Dr. Yarbrough of Johnson's history of drug addiction. Petition at 25; Appendix 1 (Affidavit of Dr. Ronald Yarbrough). Dr. Yarbrough had 1½ to 2½ hours to interview, examine, and test defendant Johnson.

Dr. Yarbrough did testify the next morning before the jury. He was candid in saying that because of the time constraints his evaluation was only sufficient to draw a strong hypothesis. We also know from the motion for continuance that Dr. Yarbrough's evaluation was only preliminary and that additional testing and evaluation were needed.

Dr. Yarbrough told the jury that Johnson had a high average range of intelligence, and an extremely high level of common sense. He testified that Johnson was a survivor, that he thought quickly on his feet, and was a good decision maker. He testified that Johnson had a good sense of humor, had a good perception of things, was in contact with reality, and was not schizophrenic or psychotic. He testified that Johnson had positive feelings about his family. The sole mitigating evidence which Dr. Yarbrough presented to the jury was that Johnson was relatively free of conflicts and did not have significant anxiety until he got into serious difficulty; however, the tests strongly suggested that under states of intense emotional stimuli, Johnson's normal modes of behavior, of decision making and seeing things would deteriorate. Defense counsel asked Dr. Yarbrough a question which was obviously an attempt to elicit evidence in support of the statutory mitigating circumstance relating to emotional disturbance:

---

7. The opinion for the court misunderstands the standard I propose; the majority opinion mistakenly characterizes my proposed standard as being the same as the standard governing the prejudice prong (i.e., of the "cause and prejudice" analysis and of the ineffective assistance of counsel analysis). My proposed standard differs from the prejudice prong in two important respects. First, the actual innocence exception excludes the "all too ordinary cases" where the petitioner's claim is based on the admission of illegal evidence. Unlike the prejudice prong, my actual innocence standard requires actual factual inaccuracy. Second, and significantly, my proposed standard employs the higher "more likely than not" test rather than the lower "reasonable probability" test which is utilized in the prejudice prong analysis. As the Supreme Court said in *Strickland v. Washington,* this higher test "reflects the profound importance of finality in criminal proceedings." Moreover, as indicated in the text above, the experience in the cases to date demonstrates that the standard I propose will properly implement the Supreme Court mandate that the actual innocence exception be reserved for the extraordinary case.

And would his response in those situations—in those stressful situations, be characterized—could it be characterized or would you characterize it as the product of a mental or emotional disturbance?

Dr. Yarbrough's answer was merely:

Well, I would say that his ability to think and make decisions at a level that he's capable of functioning in a non-stressful situation deteriorates dramatically.

Record at 1521. On cross-examination, Dr. Yarbrough expressly conceded that there was no evidence of the statutory mitigating circumstance relating to the lack of capacity to appreciate the criminality of his conduct.

It is instructive to compare the foregoing testimony with the proffer in the instant proceedings that Dr. Yarbrough, if he had had appropriate time to evaluate Johnson and if he had known Johnson's mental health history including in particular his history of drug addiction, would have testified as follows. Dr. Yarbrough would testify that Johnson's addiction far exceeded that of a normal addict. Based on the newly-adduced evidence of the very severe drug addiction and the evidence of Johnson's abuse of drugs immediately preceding the instant murder, Dr. Yarbrough's professional opinion was that Johnson's "severe addiction was the primary guiding force in his life around the time of June, 1978," that Johnson was "under the influence of a totally controlling, extreme drug addiction which would have led to his mind being totally controlled by the presence or absence of drugs. In my professional opinion, this would qualify under mitigating circumstances for the F.S.1985, § 921.141(6)(b)" [the extreme mental or emotional disturbance mitigating circumstance].[8] Dr. Yarbrough would also give his professional opinion that Johnson

acted under extreme duress, when fired upon, and as indicated from his psychological testing, went into a totally emotional, irrational mode of response. At that instant, my opinion is that, due to his drug abuse and combined emotionality of the moment, Marvin's [Johnson's] capacity to appreciate the criminality of his behavior or to conform to the requirements of the law were substantially impaired. This set of circumstances would qualify under F.S.1985, § 921.141(6)(e) and (f) [the extreme duress mitigating circumstance and the capacity to appreciate the criminality or to conform to the law mitigating circumstance].[9]

Other proffered evidence tends to confirm Dr. Yarbrough's revised assessment. Johnson has now been evaluated by Dr. Robert A. Fox, Jr. and by Dr. Peter Macaluso. Both of them conclude that Johnson's physical and psychological addiction was so overwhelming that it overpowered his capacity for rational thought.[10] Both doctors conclude that Johnson's voracious appetite for drugs together with the fact that he had consumed a large variety of addictive narcotics on the day of the offense and the stress Johnson experienced when the victim began firing at him rendered Johnson unable to curtail his criminal actions or appreciate the nature of his actions.[11]

Moreover, it is significant that Johnson's drug addiction began not in the usual way which a fact finder might ordinarily condemn, but as a result of a motorcycle accident. The proffered evidence indicates that Johnson's drug addiction began as a result of the severe pain Johnson experienced from a serious back injury in a motorcycle accident. When the prescribed pain medication was discontinued, Johnson began self administering illegal narcotics in an attempt to ease the continuing pain.[12]

8. Petition at 124; Appendix 1 (Affidavit of Dr. Ronald Yarbrough).

9. *Id.*

10. Petition at 130, 135–36; Appendix 2 (Affidavit of Dr. Robert A. Fox, Jr.); Appendix 3 (Affidavit of Dr. Peter Macaluso).

11. *Id.;* Petition at 128, 130, 134, 136; Appendix 2, Appendix 3.

12. Petition at 127; Appendix 2 (Affidavit of Dr. Robert A. Fox); Petition at 133; Appendix 3 (Affidavit of Dr. Peter Macaluso); Appendix 8(e) (Affidavit of Sherrie Inez Koehler); Appendix 8(d) (Affidavit of Gwendolyn Gayle Millicin);

The significance of the new evidence is obvious. It is fair to say that there was no such mitigating evidence at sentencing. The sentencing judge so found. Now the proffered evidence indicates the presence of three statutory mitigating circumstances. *See* Fla.Stat. § 921.141(6)(b) ("The capital felony was committed while the defendant was under the influence of extreme mental or emotional disturbance"); § 921.141(6)(e) ("The defendant acted under extreme duress or under substantial domination of another person"); § 921.141(6)(f) ("The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired").

The primary claim of ineffective assistance of counsel in this case is that counsel had a little over one month between the jury sentencing on December 9, and the sentencing hearing before the judge on January 12. Counsel knew that Dr. Yarbrough's evaluation was preliminary and that further evaluation was needed. However, counsel did not utilize that time to complete the mental health evaluation, and present the substantial mitigating evidence that was available.

It is also significant that the record suggests that the sentencing judge overrode the jury verdict of life imprisonment and imposed the death penalty because he believed that there were no mitigating circumstances. *See* Record at 1723. The gist of the prosecutor's argument was that the judge should impose the death penalty because there were no mitigating circumstances. The prosecutor argued that there were no mitigating circumstances, and on that basis urged the sentencing judge to impose the death penalty.

Your honor, don't give some defendant who later comes before ... [a court]—to build a record on appeal by sentencing this defendant to life, and they say— "[w]ell look at all the aggravating circumstances this defendant had, and there weren't any mitigating circumstances, and he got life.

Record at 1756. In the written findings to support imposition of the death penalty, the sentencing judge found:

Marvin Edwin Johnson was not under the influence of extreme mental or emotional disturbance on June 7, 1978, when he committed the murder and robbery ... [t]here was no evidence that alcohol or drugs were being used by Marvin Edwin Johnson at the time the murder was committed.

Record at 1722. In rejecting the extreme duress mitigating circumstance, the sentencing court said: "The evidence submitted by the defendant's psychologist during the penalty phase of the trial clearly established that the defendant was not acting under duress...." Record at 1723. The sentencing judge also found that the "evidence clearly established that Marvin Edwin Johnson fully appreciated the criminality of his conduct and was capable of conforming his conduct to the requirements of law." Record at 1723. Finally in imposing the death penalty, the sentencing court held:

[A]fter weighing the aggravating and mitigating circumstances in this case, sufficient aggravating circumstances exist, as enumerated in subsection (5) of the statute and set forth in these findings of fact, for the imposition of the death penalty; and that there are *no mitigating circumstances*, as enumerated in subsection (6) and set forth in these findings of fact, *to weigh against the aggravating circumstances....*

Record at 1723 (emphasis added).

The question before this court is whether the fundamental miscarriage of justice concept permits consideration of the instant defaulted claim of ineffective assistance of sentencing counsel. Under the standard I propose, the first prong of the inquiry is whether the alleged constitutional error has resulted in a factually inaccurate sentencing profile. It is clear from the fore-

Appendix 8(c) (Affidavit of Jerry Mitchell Lawrence); Appendix 8(b) (Affidavit of Terry Wayne Gayle).

going discussion that the proffered evidence would establish that the sentencing judge based his decision on a factually inaccurate sentencing profile.[13] There was no evidence before the sentencing judge to establish the emotional disturbance mitigating circumstance, the extreme duress mitigating circumstance, or the mitigating circumstance relating to the capacity to appreciate the criminality of his conduct or conform his conduct to the law. The sentencing judge expressly found that these mitigating circumstances were not present. In fact, the sentencing judge found that no mitigating circumstances were present. However, the proffered evidence would establish the presence of three statutory mitigating circumstances, relating to extreme emotional disturbance, extreme duress, and the capacity to appreciate the criminality of the conduct or conform conduct to the law.

The second prong of the proposed standard is whether the factual inaccuracies in the sentencing profile were so significant that it is more likely than not that the result would have been different. The posture of the sentencing decision in this case is significant. In this case, the jury had returned a verdict recommending life imprisonment. Under Florida law, the sentencing judge is permitted to override the jury's recommendation of life only in cases in which it is determined that the facts

suggesting death are so clear and convincing that virtually no reasonable person could differ. *Tedder v. State*, 322 So.2d 908, 910 (Fla.1975). Should a reasonable basis in fact exist which would support the jury's recommended sentence, then a judicial decision to override that recommendation will be vacated. *See, e.g., Freeman v. State*, 547 So.2d 125, 129 (Fla.1989); *Brown v. State*, 526 So.2d 903, 907–08 (Fla.), cert. denied, 488 U.S. 944, 109 S.Ct. 371, 102 L.Ed.2d 361 (1988); *Hawkins v. State*, 436 So.2d 44, 47 (Fla.1983); *Webb v. State*, 433 So.2d 496, 499 (Fla.1983); *Barfield v. State*, 402 So.2d 377, 382 (Fla.1981); *Jacobs v. State*, 396 So.2d 713, 717 (Fla. 1981); *Brown v. State*, 367 So.2d 616, 625 (Fla.1979); *Provence v. State*, 337 So.2d 783, 787 (Fla.1976), cert. denied, 431 U.S. 969, 97 S.Ct. 2929, 53 L.Ed.2d 1065 (1977). *See generally Mann v. Dugger*, 844 F.2d 1446, 1451 (11th Cir.1988) (collecting additional cases), cert. denied, 489 U.S. 1071, 109 S.Ct. 1353, 103 L.Ed.2d 821 (1989).

Thus the question before the court is whether the sentencing judge would have overridden the jury's recommendation of life if counsel had adduced the evidence now proffered establishing the three statutory mitigating circumstances, and whether the Florida Supreme Court would have vacated any such override.[14] Relevant to this

---

**13.** There has been no evidentiary hearing on this claim either in state court or in federal court. A federal habeas petitioner is entitled to an evidentiary hearing only if the proffered facts would, if proved, entitle him to relief. *Townsend v. Sain*, 372 U.S. 293, 312, 83 S.Ct. 745, 756, 9 L.Ed.2d 770 (1963). No serious argument could be made in this case that the record conclusively demonstrates that the proffered facts are untrue. *Blackledge v. Allison*, 431 U.S. 63, 97 S.Ct. 1621, 52 L.Ed.2d 136 (1977).

The opinion for the court suggests that the fact finder might not have accepted Dr. Yarbrough's testimony that there were three statutory mitigating circumstances. However, the majority ignores the standard set out in *Townsend* and *Blackledge* governing the circumstances which require an evidentiary hearing. We cannot know whether the fact finder would have accepted Dr. Yarbrough's testimony without an evidentiary hearing.

The appropriate procedure in a case like this, where there has been no evidentiary hearing, is to assume the truth of the proffered facts, and

determine whether the habeas petitioner can satisfy the high standard necessary to obtain relief. *Porter v. Wainwright*, 805 F.2d 930 (11th Cir.1986). If the petitioner surmounts that hurdle, then the case is remanded to the district court where petitioner will have an opportunity to prove the proffered facts.

**14.** The Florida Supreme Court has held that the *Tedder* standard applies even in cases where evidence is presented to the sentencing judge which was not presented to the jury. *Cochran v. State*, 547 So.2d 928, 931–32 (Fla.1989). The *Cochran* court stated that under Florida law, the fact that evidence not heard by the jury is presented to the sentencing judge:

> does not alter this Court's responsibility to review the sentence under the *Tedder* standard. When the sentencing judge is presented with evidence not considered by the jury, the jury's recommendation still retains great weight.

*See also Richardson v. State*, 437 So.2d 1091, 1095 (Fla.1983) (judge should have applied *Ted-*

inquiry is the fact that the Florida Supreme Court "frequently has reversed jury overrides where the jury could have found alcohol or drug abuse as a mitigating circumstance." *Fead v. State*, 512 So.2d 176, 178 (Fla.1987). *See Holsworth v. State*, 522 So.2d 348 (Fla.1988) (override improper in light of mitigating evidence that capacity to appreciate the criminality of his conduct or conform his conduct to the law was impaired as a result of drugs and alcohol); *Masterson v. State*, 516 So.2d 256 (Fla. 1987) (override improper in light of mitigating evidence of alcohol and drug problems dating back to injuries in Vietnam and evidence that defendants consumed substantial amounts of drugs and alcohol on the day of the murder); *Cannady v. State*, 427 So.2d 723 (Fla.1983) (jury had reasonable basis for recommending life sentence in light of testimony concerning the psychological effects caused by defendant's history of indiscriminate drug use); *see also Burch v. State*, 522 So.2d 810 (Fla.1988); *Amazon v. State*, 487 So.2d 8 (Fla.), *cert. denied*, 479 U.S. 914, 107 S.Ct. 314, 93 L.Ed.2d 288 (1986); *Huddleston v. State*, 475 So.2d 204 (Fla.1985); *Norris v. State*, 429 So.2d 688 (Fla.1983). The proffered mitigating evidence in this case is very similar to that which precluded the override in *Holsworth, supra*, and *Masterson, supra*. It is more substantial than the mitigating evidence of intoxication or drug abuse which was instrumental in precluding the override in the other cases cited. In addition, the proffered evidence in this case indicates that Johnson's addiction had a more benign origin—i.e., the motorcycle accident—thus providing additional mitigating impact. *See Masterson, supra* (noting that the defendant had been introduced to drugs in Vietnam).

Also relevant to this inquiry is the fact that the override issue was an extremely close question even in the absence of the new mitigating evidence now proffered. Five different justices of the Florida Supreme Court—including four who are currently sitting on that court—have at various times questioned the appropriateness

of the original override in this case. On direct appeal, three justices dissented as to imposition of the death penalty on the ground that the override of the jury's recommendation of life was improper. *Johnson v. State*, 393 So.2d 1069, 1075–76 (Fla. 1980) (Sundberg, C.J., Overton and McDonald, JJ., dissenting from the sentence in various opinions). Two other members of the Supreme Court of Florida, Justices Barkett and Kogan, agreed with the majority in *Johnson v. Dugger*, 523 So.2d 161 (Fla.1988), that the "law of the case" precluded further consideration of the jury override issue, but expressed their disagreement with the prior determination on direct appeal which upheld the jury override. 523 So.2d at 163 (Barkett, J., specially concurring) ("I agree that we are bound by the law of the case on the jury override issue. However, I believe there was a reasonable basis for the jury's recommendation of life and thus that the court originally erred in sustaining the jury override"). Thus, a majority of the present Justices of the Supreme Court of Florida have expressed the view, even without the benefit of the newly proffered evidence, that the jury override was improper.

In light of the strict *Tedder* standard governing jury overrides, in light of the fact that the override issue was a close question even in the absence of the proffered mitigating circumstances, in light of the substantial force of the proffered mitigating evidence, and in light of the indication that the sentencing judge overrode the jury verdict because he believed that there were "no mitigating circumstances ... to weigh against the aggravating circumstances," I conclude that it is more likely than not that the sentencing judge would not have overridden the jury verdict had counsel adduced before him the evidence now proffered. Indeed, the totality of the circumstances, including the proffered statutory mitigating circumstances, persuade me that there is an even higher degree of certainty in this regard. Moreover, the Florida case law cited above demonstrates

*der* standard even though the sentencing jury had not heard all of the facts and circumstances

because a different jury had been used during the guilt phase).

**1206**

that the Florida Supreme Court would have vacated any override under such circumstances, thus increasing the degree of certainty that the result in this case would have been different but for the failure of sentencing counsel to present the mitigating evidence.

For the foregoing reasons, I respectfully dissent. The majority's analysis and conclusion will result in a fundamental miscarriage of justice. Because the test for fundamental miscarriage of justice is the same, whether the context is excuse for a state procedural default or for abuse of the writ, *McCleskey v. Zant,* —— U.S. ——, 111 S.Ct. 1454, 113 L.Ed.2d 517 (1991), both should be excused in this case and the case should be remanded to the district court to afford Johnson the opportunity at an evidentiary hearing to prove the facts he now proffers.